


FILED

Mar 05 2019, 12:23 pm

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

IN THE

# Indiana Supreme Court

Supreme Court Case No. 19S-PC-128

## Angelo Bobadilla,

*Appellant (Petitioner),*

—v—

## State of Indiana,

*Appellee (Respondent).*

Argued: June 19, 2018 | Decided: March 5, 2019

Appeal from the Hamilton Superior Court,
No. 29D04-1612-PC-9318
The Honorable J. Richard Campbell, Judge.

On Petition to Transfer from the Indiana Court of Appeals,
No. 29A02-1706-PC-1203

**Opinion by Justice Goff**

Chief Justice Rush and Justice David concur.
Justice Massa dissents with separate opinion in which Justice Slaughter joins.

**Goff, Justice.**

"Life changes in the instant. The ordinary instant."[1] Perhaps nothing is more ordinary in Indiana's justice system than a guilty-plea hearing, but these everyday proceedings undoubtedly alter peoples' lives. Over three years ago, Angelo Bobadilla entered an Indiana courtroom to plead guilty to two low-level misdemeanors. But when the then-teenager exited the courtroom, he didn't know that his guilty plea made him a deportable felon under federal immigration law.

Bobadilla's life changed the moment he pleaded guilty to stealing less than $20 of merchandise from Walmart. Upon realizing his plea's dire implications, a desperate Bobadilla sought post-conviction relief, alleging ineffective assistance of counsel: his attorney provided deficient performance that prejudiced him. We agree.

Today we hold that counsel rendered ineffective assistance to Bobadilla. On the trial court's standard advisement of rights form, counsel affirmatively marked as "not applicable" the warning about potential immigration consequences from a criminal conviction—without so much as asking Bobadilla's citizenship status. This mistake prejudiced Bobadilla because the record shows a reasonable probability that, had he known his plea's full consequences, he would have rejected that plea bargain and instead insisted on going to trial.

## Factual and Procedural History

On March 1, 2016, nineteen-year-old Angelo Bobadilla entered Hamilton Superior Court 4 intending to plead guilty to two misdemeanors. Eight months earlier, a Walmart loss prevention employee detained Bobadilla on suspicion of shoplifting after seeing him conceal a pack of underwear and a pack of t-shirts, then walk past all points of sale without paying. Westfield police officer Joseph Hopkins responded to the

---

[1] Joan Didion, THE YEAR OF MAGICAL THINKING p. 3 (2005).

store and arrested Bobadilla, who admitted taking "the merchandise in question because he needed them." Probable Cause Affidavit, *State v. Bobadilla*, No. 29D04-1507-CM-6199 (Super. Ct. July 20, 2015).[2] During the search-incident-to-arrest Officer Hopkins found in Bobadilla's backpack a small plastic bag containing marijuana, a pipe smelling of burnt marijuana, and one Vicodin tablet, which Bobadilla admitted had not been prescribed to him.

After transporting Bobadilla to the Hamilton County Jail, Officer Hopkins completed a Book-In Slip listing Bobadilla's birthplace as Cuernavaca, Mexico.

The next day the State charged Bobadilla with four counts: Theft and Possession of a Controlled Substance, both Class A Misdemeanors; Possession of Marijuana, a Class B Misdemeanor; and Possession of Paraphernalia, a Class C Misdemeanor. The State's charging information contained a partially redacted social security number. During discovery, the State released these documents (the charging information, the probable cause affidavit, and Book-In Slip) to Bobadilla's counsel.

Bobadilla had as trial counsel a criminal defense attorney with over thirty years' experience. Trial counsel negotiated a plea agreement whereby Bobadilla agreed to plead guilty to two counts in exchange for dismissal of the remaining counts, but he would receive the maximum sentence allowed—albeit a completely suspended sentence.

When Bobadilla arrived at the courthouse on March 1st for his guilty plea hearing, his attorney presented him with the Hamilton County Superior Court's standard advisement of rights form, titled "Misdemeanors and Level 6 Felony Advisement Form." Appellant's App. Vol. II, pp. 115–16; Petitioner's Ex. 1. Prior to handing the form to Bobadilla to read and then sign, counsel identified certain advisements he believed did not pertain to Bobadilla by marking them "N/A" for "not applicable." Appellant's App. Vol. II, pp. 115–16; Petitioner's Ex. 1; Tr. pp.

---

[2] As noted *infra* page 5, the post-conviction court judicially noticed this document.

5-7. Most notably—without first talking with Bobadilla—counsel marked "N/A" next to the following advisement:

> If you are not a U.S. citizen, a criminal conviction may have immigration consequences, including deportation. You should discuss this possibility with your attorney because if you do plead guilty, it will result in a criminal conviction.

Appellant's App. Vol. II, pp. 26, 116; Petitioner's Ex. 1. What trial counsel did not know was that Bobadilla was not a United States citizen, but a "Dreamer" under the Department of Homeland Security's Deferred Action for Childhood Arrivals (DACA) program. Bobadilla read and signed the form, pleaded guilty, and received the promised suspended sentence—one year for A-Misdemeanor Theft and 180 days for B-Misdemeanor Marijuana Possession. By all accounts, the guilty-plea hearing went as expected—quickly and routinely. At the end, the court wished Bobadilla good luck, Bobadilla thanked the judge, and he left the courthouse.

Bobadilla, however, soon learned his routine guilty plea posed a serious problem for him. Following a probation violation, Bobadilla consulted different legal counsel and learned his A-Misdemeanor Theft conviction and its concomitant one-year sentence amounted to an "aggravated felony" under federal immigration law, making him deportable.[3] Bobadilla immediately filed a verified petition for post-conviction relief, alleging he received ineffective assistance of trial counsel under *Strickland v. Washington*, 466 U.S. 668 (1984), because he was not adequately advised of the consequences of his plea. Specifically, he argued

---

[3] "Any alien (including an alien crewman) in and admitted to the United States shall, upon the order of the Attorney General, be removed if the alien is within one or more of the following classes of deportable aliens: Any alien who is convicted of an aggravated felony at any time after admission is deportable." 8 U.S.C.A. § 1227(a)(2)(A)(iii) (West 2017).

"The term 'aggravated felony' means—a theft offense (including receipt of stolen property) or burglary offense for which the term of imprisonment [is] at least one year." *Id.* § 1101(a)(43)(G).

his trial attorney rendered deficient performance that prejudiced him by failing to ascertain his citizenship status before marking "N/A" next to the advisement of rights form's paragraph regarding citizenship and immigration status.

Just one year after initially pleading guilty, on March 7, 2017, Bobadilla returned to the same court for a hearing on his petition for post-conviction relief. Trial counsel testified first and confirmed that he wrote "N/A" next to the advisement on citizenship status without ever asking Bobadilla about his citizenship or immigration status. He said he simply assumed Bobadilla was a United States citizen and did not understand that "Bobadilla" was a Hispanic name. Counsel testified he would not have marked "N/A" had he known Bobadilla was not a U.S. citizen.

Bobadilla testified next and corroborated that his trial attorney never asked him about his citizenship status. Bobadilla said he understood "N/A" to mean "not applicable." He testified he read those paragraphs marked "N/A", but he relied on counsel's advice that those paragraphs did not apply to him and he did not ask about them. Bobadilla testified that if the citizenship paragraph had not been marked "N/A", he would have reacted differently and "take[n] a different approach to that." Tr. at pp. 16–17.

Bobadilla informed the court that his DACA status was at risk and he was now deportable following his theft conviction. Bobadilla reported he had not been contacted by Immigration and Customs Enforcement (ICE) and he was not, at that moment, subject to imminent deportation. Before resting his case, Bobadilla's post-conviction counsel asked the court to take judicial notice of the criminal court cause number file and the State supported that motion.

On April 17, 2017, the court issued an order denying Bobadilla post-conviction relief. The court acknowledged that United States Supreme Court precedent requires an attorney to inform the noncitizen criminal defendant whether a guilty plea carries a risk of deportation. But the court phrased the issue before it narrowly as "whether an attorney must first affirmatively ascertain whether his client is a U.S. citizen in the absence of

any evidence that he is not, before the attorney would have to advise his client of the risk of deportation." Appellant's App. Vol. II, p. 38.

In its factual findings the postconviction court repeatedly noted that Bobadilla spoke with no foreign accent and that he could read and understand English. It further found "that the charging information and the probable cause affidavit contain no information that would suggest that [Bobadilla] was not a U.S. citizen." *Id.* at 36. With these and other facts, the court concluded that trial counsel did not render deficient performance because he "did not know, and had no reason to suspect, that [Bobadilla] was not a native-born citizen of the United States." *Id.* at 40. Because the post-conviction court found no deficient performance, it did not consider *Strickland*'s prejudice prong.

Meanwhile, Bobadilla's situation grew more precarious. On May 3, 2017, he was transferred from the Hamilton County Jail into ICE's custody. That same day, ICE processed him and issued a Notice of Intent to Issue a Final Administrative Removal Order. With this turn of events, at 12 p.m. on Friday, May 12, 2017, Bobadilla filed with the post-conviction court an emergency motion to correct error and a request for an expedited hearing.

Bobadilla attached to his motion the Book-In Slip listing Mexico as his birthplace. He used this form, which the State released to trial counsel during discovery, to argue that trial counsel had reason to know he was not a U.S. citizen—contrary to the court's conclusion. Bobadilla also attached to the motion ICE's removal order. The emergency motion informed the court the order would become final on May 17, 2017, and executable fourteen days after that, meaning Bobadilla could be removed from the United States as soon as May 31, 2017. Citing information from ICE's FAQ webpage, the motion stated: "[a]fter removal from the U.S. Bobadilla will have no effective immigration remedy . . . any favorable decision on this motion or on appeal will likely be meaningless." *Id.* at 46. Without a hearing, and without explanation, the post-conviction court denied Bobadilla's motion the following Monday, May 15, 2017.

Bobadilla was deported, and the record is silent on his current whereabouts.

Bobadilla's appellate counsel nevertheless filed an appeal on his behalf. A divided Court of Appeals affirmed the post-conviction court's decision, albeit on different legal grounds. *Bobadilla v. State*, 93 N.E.3d 783 (Ind. Ct. App. 2018). Unlike the lower court, the Court of Appeals decided the matter on *Strickland*'s prejudice prong. *Id.* at 786–87. The court noted "the State concedes that counsel's performance here may have been deficient," *Id.* at 786 n.5 (citing Appellee's Br. pp. 11, 13), and so declined to address whether the post-conviction court erred in finding no deficient performance, *id.* The majority ultimately held that Bobadilla failed to show that he was prejudiced by trial counsel's failure to advise him that his guilty plea carried the risk of deportation. *Id.* at 786. Chief Judge Vaidik dissented, believing Bobadilla received deficient performance and suffered prejudice because, had he been properly advised, he would have rejected the plea agreement and gone to trial. *Id.* at 788–90.

Bobadilla now petitions for transfer, which we grant, thereby vacating the Court of Appeals opinion. Ind. Appellate Rule 58(A).

## Standard of Review

Post-conviction actions are civil proceedings, meaning the petitioner (the prior criminal defendant) must prove his claims by a preponderance of the evidence. Ind. Post-Conviction Rule 1(5); *Wilkes v. State*, 984 N.E.2d 1236, 1240 (Ind. 2013). If he fails to meet this burden and receives a denial of post-conviction relief, then he proceeds from a negative judgment and on appeal must prove "that the evidence, as a whole, unmistakably and unerringly points to a conclusion contrary to the post-conviction court's decision." *Wilkes*, 984 N.E.2d at 1240 (quoting *Ben-Yisrayl v. State*, 738 N.E.2d 253, 258 (Ind. 2000)). When reviewing the court's order denying relief, we will "not defer to the post-conviction court's legal conclusions," and the "findings and judgment will be reversed only upon a showing of clear error—that which leaves us with a definite and firm conviction that a mistake has been made." *Humphrey v. State*, 73 N.E.3d 677, 682 (Ind. 2017) (quoting *Ben-Yisrayl v. State*, 729 N.E.2d 102, 106 (Ind. 2000)).

# Discussion and Decision

The criminal defendant's right to counsel is foundational to our criminal justice system, giving it legitimacy and fairness. The Sixth Amendment to the United States Constitution guarantees criminal defendants the right to counsel and mandates "that 'the right to counsel is the right to the effective assistance of counsel.'" *Strickland*, 466 U.S. at 686 (quoting *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970)). Criminal defendants deserve—and the Constitution demands—assistance from a competent attorney to help them through the justice system.

When evaluating a defendant's ineffective-assistance-of-counsel claim, we apply the well-established, two-part *Strickland* test. *Humphrey*, 73 N.E.3d at 682. The defendant must prove: (1) counsel rendered deficient performance, meaning counsel's representation fell below an objective standard of reasonableness as gauged by prevailing professional norms; and (2) counsel's deficient performance prejudiced the defendant, i.e., but for counsel's errors the result of the proceeding would have been different. *Ward v. State*, 969 N.E.2d 46, 51 (Ind. 2012) (citing *Strickland*, 466

U.S. at 687).[4] The *Strickland* standard is not limited to the trial or appellate phases in criminal proceedings, but also applies when defendants allege ineffective assistance during the guilty plea phase. *Segura v. State*, 749 N.E.2d 496, 500–01 (Ind. 2001). *See also Padilla v. Kentucky*, 559 U.S. 356, 373 (2010) ("[W]e have long recognized that the negotiation of a plea bargain is a critical phase of litigation for purposes of the Sixth Amendment right to effective assistance of counsel.").

Here Bobadilla alleges his trial counsel proved ineffective for failing to advise him that his plea agreement made him subject to deportation. Specifically, he alleges that counsel's failure to advise him on possible deportation and affirmatively marking "N/A" next to the citizenship status advisement amounted to deficient performance. He also contends that his attorney's deficient performance prejudiced him.

Bobadilla's ineffective-assistance-of-counsel arguments, arising from his situation of having unwittingly made himself a deportable felon by reason of a misdemeanor guilty plea, take us into an area of law that has

---

[4] Of course, there are extreme circumstances where courts may presume ineffectiveness, thereby removing the case from *Strickland*'s two-part analysis. *Ward*, 969 N.E.2d at 77 ("[I]n certain limited circumstances of extreme magnitude, prejudice to a criminal defendant is so likely that an inquiry into counsel's actual performance is not required.") (quoting *United States v. Cronic*, 466 U.S. 648, 658–62 (1984)). In other words, if an attorney's performance effectively amounted to a complete denial of counsel at a critical stage of the proceedings, courts can presume deficiency and prejudice. *Cronic*, 466 U.S. at 658–59. But *Cronic* is rarely applied since it imposes "an extremely heavy burden" on defendants. *Ward*, 969 N.E.2d at 77. Here Bobadilla's appellate counsel nearly broached a *Cronic* argument during rebuttal at oral argument, saying:

> Sometimes the prejudice is inherent in the incompetence. You don't necessarily need in every case to show some other type of prejudice. . . . If our trial counsel does not know enough about our immigration status to inform us correctly to make a knowing, intelligent, and voluntary decision to plead guilty, we have suffered prejudice. Plain and simple. It's inherent in that specific type of incompetence.

Oral Argument 31:26–32:03. But, unfortunately, counsel did not flesh-out a *Cronic* theory or cite to authority in that presentation. Nor did counsel brief *Cronic* before this Court or the Court of Appeals to give the State a chance to respond. Since neither party adequately raised *Cronic*, waiver principles and judicial restraint prevent us from considering it now. *See St. John v. State*, 523 N.E.2d 1353, 1355 (Ind. 1988).

seen recent changes. We therefore find it beneficial to parse the applicable law and update our jurisprudence where necessary, looking first at *Strickland*'s deficiency prong and then its prejudice prong.

## I. Attorneys render constitutionally deficient performance if they do not advise clients about potential immigration consequences from pleading guilty.

Like a trial, the guilty-plea process presents dangers for attorneys to commit errors. One potential pitfall is incorrectly advising clients as to consequences of pleading guilty, particularly immigration consequences. *See Padilla*, 559 U.S. at 373–74 (likening the severity of deportation to banishment or exile).

In *Padilla*, the United States Supreme Court considered whether counsel provided ineffective assistance by giving inaccurate advice to a client about immigration consequences resulting from a criminal conviction. There counsel failed to tell her client, a native of Honduras, that he could be deported as a consequence of pleading guilty to drug charges, and even told him he did not need to worry about his immigration status. *Id.* at 359. Like here, the client sought post-conviction relief when he realized he faced deportation.

Even eight years ago the high Court observed: "[C]hanges to our immigration law have dramatically raised the stakes of a noncitizen's criminal conviction." *Id.* at 364. It explained: "The 'drastic measure' of deportation or removal . . . is now virtually inevitable for a vast number of noncitizens convicted of crimes." *Id.* at 360 (internal citation omitted). And the Court went on to say: "The importance of accurate legal advice for non-citizens accused of crimes has never been more important." *Id.* at 364. Because the stakes for noncitizen criminal defendants remain high, accurate legal advice about immigration consequences is just as important today.

The *Padilla* Court first determined that, even though immigration consequences are technically collateral and not direct consequences of a conviction, "advice regarding deportation" falls within "the ambit of the Sixth Amendment right to counsel." *Id.* at 366. Accordingly, a claim like Padilla's—that counsel's failure to advise on immigration consequences amounted to ineffective assistance—was subject to *Strickland*'s two-part analysis.

During its deficient-performance evaluation, the Court opined: "It is quintessentially the duty of counsel to provide her client with available advice about an issue like deportation, and the failure to do so 'clearly satisfies the first prong of the *Strickland* analysis.'" *Id.* at 371 (citation omitted). The Court ultimately held that counsel rendered deficient performance by providing erroneous advice (or even no advice) about a client's immigration status. *Id.* at 373–74. Speaking in absolute terms, the Supreme Court said: "[C]ounsel **must** inform her client whether his plea carries a risk of deportation." *Id.* at 374 (emphasis added). The *Padilla* Court did not reach *Strickland*'s prejudice prong but remanded the case for that inquiry. *Id.* at 374–75.

## A. *Padilla* affects Indiana's jurisprudence.

*Padilla* undoubtedly prompted a sea change in Sixth Amendment ineffective assistance of counsel jurisprudence everywhere. But examining Indiana precedent, we see that *Padilla* produced smaller waves here because our state's case law already contained *Padilla*-esque requirements.

Remarkably, our Court of Appeals presaged *Padilla* sixteen years earlier. Considering a factually similar ineffective assistance claim—i.e., noncitizen criminal defendant collaterally attacking his guilty plea by claiming his attorney failed to advise him of deportation consequences— the Court of Appeals said an attorney's "'guiding hand' would be a poor one indeed if it did not point out to the accused the deportation consequences of a guilty plea." *Williams v. State*, 641 N.E.2d 44, 49 (Ind. Ct. App. 1994). Relying upon the Indiana Constitution, particularly Article I, Section 13's effective-assistance-of-counsel guarantee to criminal defendants, the court concluded: "It is our firm belief that the consequence

of deportation, whether labelled collateral or not, is of sufficient seriousness that it constitutes ineffective assistance for an attorney to fail to advise a noncitizen defendant of the deportation consequences of a guilty plea." *Id*. Though lying fallow here, the Indiana Constitution has mandated that attorneys advise clients of the immigration consequences of a criminal conviction since 1994.

Several years later in *Segura v. State*, this Court agreed with the *Williams* Court, but not in absolute terms. 749 N.E.2d at 500. Defendant Segura brought an ineffective-assistance-of-counsel claim under the Sixth Amendment rather than Article I, Section 13. He sought post-conviction relief from his guilty plea and subsequent ten-year sentence for dealing in cocaine because his trial counsel never told him that deportation could be a consequence of pleading guilty. *Id.* at 499. We, therefore, considered "whether [a defendant's] trial counsel was ineffective for failing to inform him of the possibility of deportation if he pleaded guilty." *Id.* at 498. In applying *Strickland*'s deficiency prong, we recognized that ineffective-assistance-of-counsel claims are "fact sensitive and turn[] on a number of factors." *Id.* at 500. We concluded that "the failure to advise of the consequences of deportation can, under **some** circumstances, constitute deficient performance." *Id.* at 500 (emphasis added).

*Segura* predated *Padilla* by nine years and the holdings roughly align, although *Padilla* spoke in absolute terms while *Segura* used relative terms. To the extent *Segura* left the door open for courts to decide when failing to advise a defendant on possible deportation or giving erroneous deportation advice amounts to deficient performance, *Padilla* seemingly closed that door. We are now bound by *Padilla*—attorneys must advise their clients of immigration consequences from a guilty plea; otherwise, they render constitutionally deficient performance.

But we observe that *Padilla* proceeds on the supposition that counsel **knows** his client is not a citizen. *See Padilla*, 559 U.S. at 370 (rejecting the government's affirmative-misadvice argument by stating that "[w]hen attorneys know that their clients face possible exile from this country and separation from their families, they should not be encouraged to say nothing at all"); *id.* at 387 (Alito, J., concurring) ("When a criminal defense

attorney is aware that a client is an alien, the attorney should advise the client that a criminal conviction may have adverse consequences under the immigration laws . . . ."). And, so, under *Padilla*, if counsel knows a client is a non-citizen, then "counsel must inform [the] client whether [the] plea carries a risk of deportation." *Id.* at 374; *see id.* at 372 ("For at least the past 15 years, professional norms have generally imposed an obligation on counsel to provide advice on the deportation consequences of a client's plea."). Given *Padilla*'s imperative mandate, the best practice is to ask citizenship status of every defendant—no matter name, birthplace, appearance, accent, racial classification, or language—and never presume citizenship.

Ultimately, though, Bobadilla's counsel did not know his client's citizenship status (but simply assumed it); thus, this case is not completely controlled by *Padilla*. So, we are left with the following question: When counsel is unaware of a client's citizenship status, under what circumstances will counsel's failure to inform a client of deportation consequences be deficient performance?

## B. Even when counsel is unaware of a client's citizenship status, unilaterally marking "N/A" next to a standard advisement on immigration consequences amounts to deficient performance.

Even though failing to ask a client's citizenship status may not be *per se* deficient, it certainly was here under these facts. The standard advisement of rights form that Bobadilla's attorney gave him contained a *Padilla* warning. And since Bobadilla had counsel, his attorney also had to read and sign the form. This means the Hamilton County Superior Court's own form required him to inquire into Bobadilla's citizenship status. He could not competently complete and sign the form without doing so.

Because the *Padilla* warning on the advisement of rights form required that counsel inquire about citizenship status to render competent performance, he could satisfy the requirement in two ways: either by explicit inquiry (asking the client) or implicit inquiry (letting the client

read and mark the advisement). At the very least, counsel need only read the form to his client or stand by patiently while the client reads the unmarked form to satisfy *Padilla*'s mandate. *See Padilla*, 559 U.S. at 369 (acknowledging immigration law's complexity and explaining that when the law is unclear on whether a client faces deportation, "a criminal defense attorney need do no more than advise a noncitizen client that pending criminal charges may carry a risk of adverse immigration consequences"). Reading the form puts the client on notice that a guilty plea amounts to a criminal conviction that might have immigration consequences and the client should consult an attorney.

Here Bobadilla's attorney did not simply fail to read the form to his client or wait patiently for Bobadilla to read an unmarked form, it is worse. He made the affirmative decision that the warning was "not applicable" to Bobadilla—without so much as asking him, even when the record contained clues that young Bobadilla might not be a U.S. citizen. Recall, the State served trial counsel with discovery on September 3, 2015, that included the Book-In Slip listing Bobadilla's birthplace as "Cuernavaca, Mexico"—a document the court judicially noticed. Yes, as the postconviction court noted, the record included a partially redacted Social Security number, but the information about his birthplace at the very least **suggested** that Bobadilla might not be a U.S. citizen and should have halted counsel from unilaterally marking "N/A" next to the citizenship advisement.

With that said, prudence requires that we briefly address other "facts" the post-conviction court relied upon in considering *Strickland*'s deficient performance prong—specifically, Bobadilla's name, accent, familiarity with U.S. customs, and ability to read and speak English. Since we live in a diverse country, these simplistic observations lose probative value in a citizenship inquiry. Yet the court credited them as useful facts, so we acknowledge them but in no way endorse them as proper criteria for gauging a person's citizenship status. The best practice is to never assume a client's citizenship status: always ask. In this case, that fact is made self-evident by the warning's inclusion in the advisement of rights form. Hamilton County Superior Court's standard advisement form alone

demanded an inquiry into Bobadilla's citizenship status, yet Bobadilla's counsel affirmatively marked that provision as "not applicable."

Based on all the facts, we cannot endorse the post-conviction court's clearly erroneous findings or its conclusion that counsel had "no reason to suspect" Bobadilla was not a United States citizen. We hold that Bobadilla's counsel rendered constitutionally deficient performance under *Strickland* and *Padilla* by independently marking "N/A", without first inquiring into his client's citizenship status. The post-conviction court clearly erred in finding otherwise.

## II. To prove prejudice from counsel's erroneous or nonexistent advice about immigration consequences during the plea stage, a defendant must show a reasonable probability that he would have rejected the plea and insisted on going to trial.

Although we conclude Bobadilla's trial counsel provided deficient performance, the analysis does not end there. We must address *Strickland*'s second prong—did counsel's mistake prejudice Bobadilla? To answer that question, we look to two United States Supreme Court cases. First, we discuss *Hill v. Lockhart*, which set forth the prejudice standard for cases where a defendant claims his attorney's deficient performance caused him to accept a guilty plea. We then examine the recently decided *Lee v. United States*, a deportation-consequences case that directly relied on *Hill*.

### A. The United States Supreme Court opinions in *Lee* and *Hill* provide a different prejudice standard for claims like Bobadilla's.

In *Hill v. Lockhart*, the defendant pleaded guilty to charges of murder and theft. 474 U.S. 52, 53 (1985). During the plea discussions, Hill's

counsel told him he would become parole-eligible after serving one-third of his sentence. *Id.* Two years after pleading guilty, however, Hill learned he had to serve one-half of his sentence before reaching parole-eligibility. He sought post-conviction relief. *Id.*

In considering Hill's ineffective-assistance-of-counsel claim, the Supreme Court, for the first time, explained that a defendant shows prejudice from mis-advice during the guilty-plea stage by showing a reasonable probability that he would have rejected the guilty plea and insisted on going to trial instead. *Id.* at 59 (noting a handful of cases from the federal circuit courts of appeals articulating that rule). Applying that standard, the Court determined that Hill did not show prejudice because he "alleged no special circumstances that might support the conclusion that he placed particular emphasis on his parole eligibility in deciding whether or not to plead guilty." *Id.* at 60. In other words, Hill did not establish why he would have insisted on trial.

From *Hill* we glean that in order to prove they would have rejected the guilty plea and insisted on trial, defendants must show some special circumstances that would have supported that decision. Defendants cannot simply say they would have gone to trial, they must establish rational reasons supporting why they would have made that decision.

In *Lee v. United States*, the Court relied upon *Hill* in considering a similar prejudice question, albeit in a factually distinguishable scenario. 137 S. Ct. 1958 (2017). There Defendant Lee was indicted on a single count of possessing ecstasy with intent to distribute. He retained counsel, informed counsel he was not a citizen, and instructed counsel to begin plea negotiations with the government. *Id.* at 1963. During the plea discussions, Lee repeatedly asked his attorney whether he would face deportation. *Id.* Though not a lawful citizen, Lee had lived in the United States since he moved here with his parents at age thirteen. *Id.* at 1962. After graduating high school, he began working in a restaurant and eventually became a successful restaurateur in Memphis, Tennessee. *Id.* at 1962–63. And since moving to the United States, Lee had never returned to his native South Korea. *Id.* at 1963.

Only when Lee's attorney assured him that he would not be deported, did Lee finally agree to plead guilty. *Id.* The District Court accepted the plea and sentenced Lee to one year and one day in prison. *Id.* But just like Bobadilla here, Lee soon learned that his guilty plea made him subject to deportation under federal law. *Id.* He then moved to vacate his conviction and sentence, alleging ineffective assistance of counsel.

The government conceded that Lee's counsel provided deficient performance when he erroneously advised Lee he would not be deported. *Id.* at 1964. The Supreme Court, therefore, had to decide whether Lee was prejudiced by that advice. *Id.* It held he was. *Id.* at 1969.

Ordinarily, to prove prejudice under *Strickland*, the defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* But since Lee's counsel's errors occurred in the guilty-plea stage, thereby denying Lee a trial, the Court determined that the ordinary standard could not apply and applied *Hill*. So the Court explained that defendants, like Lee and now Bobadilla, "can show prejudice by demonstrating a 'reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.'" *Id.* at 1965 (quoting *Hill*, 474 U.S. at 59). Then, per *Hill*, the Court evaluated whether Lee showed sufficient special circumstances to prove that had he been properly advised, he would have rejected the guilty plea and insisted on trial. As we see it, *Lee* did not break new ground, but took its prejudice standard directly from *Hill*, except *Lee* substituted "unusual circumstances" for "special circumstances." 137 S. Ct. at 1965, 1967.

The Court outlined Lee's unusual circumstances: his age (13) when coming to the United States; he had lived here nearly 35 years and never returned to South Korea; he was educated here; he owned and operated two restaurants here; and, finally, as their only family member living in the U.S., he alone could care for his elderly parents who still lived here. *Id.* at 1968. Based upon this evidence, the high Court observed Lee enjoyed "strong connections to the United States" while there was "no indication that he had any ties to South Korea." *Id.* The Court concluded Lee's unusual circumstances supported his claim that he placed paramount

importance on staying in the U.S. and would have rejected a guilty plea that resulted in certain deportation. *Id.* at 1965, 1967–69. The Supreme Court, therefore, held that "Lee has demonstrated a 'reasonable probability that, but for [his] counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.'" *Id.* at 1969 (quoting *Hill*, 474 U.S. at 59).

## B. *Lee* provides practical guidance.

But how do other defendants make this prejudice showing? And how should reviewing courts evaluate similar prejudice claims? Though limited, *Lee* provides some generalized guidance for assessing whether a defendant sufficiently proved prejudice from erroneous immigration advice during the guilty-plea phase. As we read it, the *Lee* Court provided three helpful pieces of guidance to the bench and bar.

First, the Supreme Court re-emphasized that these *Lee* prejudice inquiries require "a 'case-by-case examination' of the 'totality of the evidence.'" *Id.* at 1966 (quoting *Williams v. Taylor*, 529 U.S. 362, 391 (2000)). Reviewing courts, therefore, should be "asking what an **individual** defendant would have done," not what hypothetical defendants would do in similar situations. *Id.* at 1967 (emphasis added). What is rational for one defendant may not be rational for the next—it depends on the defendant's particular circumstances. For example, in *Lee* we see that the defendant's special circumstances showed he "had strong connections to this country and no other," *id.* at 1968, that, for him, made deportation just as dire as prison.

Second, the Court expressly rejected any categorical rules whereby the prosecution could negate a defendant's prejudice claim by pointing out that he had no viable trial defense or that the government had a particularly strong case against him. Rather, *Lee* acknowledged that a defendant's reasons for choosing trial over a favorable guilty plea may not depend upon the likelihood of conviction or acquittal. *Id.* at 1966–67. Deportation is a severe penalty, and, in some circumstances, an individual defendant may prioritize avoiding removal over avoiding jail time. *Id.* at 1968. *Lee*, therefore, instructs that even a defendant who faced slim

chances of winning at trial can still show prejudice—i.e., that he would have rejected a plea and insisted on trial—where his particular circumstances show that it would have been rational for him to take a chance on a trial resulting in **possible** deportation over a guilty-plea resulting in **mandatory** deportation. *Id.* at 1966, 1968.

Third, the Court cautioned that defendants cannot establish prejudice in these situations by merely claiming, "Had I been advised correctly, I would have gone to trial." Defendants must produce evidence supporting such claims. Indeed, *Lee* tells us, "Courts should not upset a plea solely because of *post hoc* assertions from a defendant about how he would have pleaded but for his attorney's deficiencies. Judges should instead look to contemporaneous evidence to substantiate a defendant's expressed preferences." *Id.* at 1967.

Viewing this guidance in light of *Hill*'s and *Lee*'s facts, we surmise that defendants prove prejudice by presenting evidence of special circumstances that corroborate their claims that they would have rejected a guilty plea and insisted upon trial, if the plea would result in deportation. Each defendant's special circumstances should show why it could have been rational for that defendant to take his chances at trial and perhaps be deported rather than plead guilty and certainly be deported. Finally, we see that special circumstances can include (but are not limited to) a defendant's ties to the United States versus those to his native country.

## C. *Lee* curbs *Segura*'s applicability in these cases.

We pause briefly to address how *Lee* affects Indiana precedent.

Like the United States Supreme Court in *Lee*, we too leaned heavily upon *Hill* when deciding *Segura v. State*, essentially embracing the same rule. There we said:

> [I]n order to state a claim for postconviction relief a petitioner may not simply allege that a plea would not have been entered. Nor is the petitioner's conclusory testimony to that effect

sufficient to prove prejudice. To state a claim of prejudice from counsel's omission or misdescription of penal consequences that attaches to both a plea and a conviction at trial, the petitioner must allege, in *Hill*'s terms, 'special circumstances,' or, as others have put it, 'objective facts' supporting the conclusion that the decision to plead was driven by the erroneous advice.

749 N.E.2d at 507 (footnotes omitted). *Segura* provided that "a petitioner may be entitled to relief if there is an objectively credible factual and legal basis from which it may be concluded that 'there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.'" *Id.* (quoting *Hill*, 474 U.S. at 59).

Unlike *Lee*, though, *Segura* favored an objective prejudice standard over a subjective one. That is, *Segura* said: "[t]here must be a showing of facts that support a reasonable probability that the hypothetical reasonable defendant would have elected to go to trial if properly advised." 749 N.E.2d at 507. With the benefit of hindsight (and *Lee*), we see two flaws in *Segura*.

First and foremost, *Segura*'s hypothetical-reasonable-defendant standard does not square with *Lee*'s this-rational-defendant inquiry. Second, regrettably, the dicta in *Segura* made the holding difficult to apply. For example, despite a clear rule, we commented that "[w]e see no reason to require revising a guilty plea if, at the end of the day, the inevitable result is conviction and the same sentence." *Id.* Likewise, in dicta, we also suggested that prejudice may be found only "in extreme cases, [where] a credible scenario can be posited that results in a truly innocent defendant pleading guilty because of incorrect advice as to the consequences." *Id.* Looking back, it becomes apparent that these statements do not fit within *Segura*'s holding and they understandably misled lower courts, causing them to rely too heavily on the strength of the State's case when evaluating prejudice. *See e.g.*, *Bobadilla*, 93 N.E.3d at 787–88; *Gulzar v. State*, 971 N.E.2d 1258, 1262 (Ind. Ct. App. 2012); *Suarez v. State*, 967 N.E.2d 552, 556–57 (Ind. Ct. App. 2012).

*Lee* now establishes that when a defendant alleges ineffective assistance of counsel based on his counsel's failure to advise him that pleading guilty could result in deportation, the prejudice inquiry is a **subjective** test, turning upon whether that particular defendant's special circumstances support his claim that, had he been properly advised, he would have rejected the plea and insisted on going to trial. *Lee* further clarified that the ultimate result at trial (conviction versus acquittal) is not the determinative factor in these prejudice inquiries because some defendants would rather be convicted and face a seemingly harsher sentence than receive a lesser sentence but face certain deportation.

To the extent *Segura* departs from *Lee*, we disapprove it.

## D. Bobadilla suffered prejudice from counsel's deficient performance.

Now turning our attention to Bobadilla's claim that he suffered prejudice from trial counsel's deficient performance, we see that the record contains few details about Bobadilla's life before his guilty plea. For example, we know little of his special circumstances such as his education, employment history, family obligations, and the like. Recall, the post-conviction court resolved the matter on *Strickland*'s deficiency prong, and it did not reach the second prong, so it made no findings or conclusions relating to prejudice. Bobadilla directs us to his statement in the post-conviction hearing, "I would take a different approach to that," Tr. p. 17, line 2, as sufficient proof of prejudice, Trans. Pet. pp. 7–9. For two reasons, we cannot count Bobadilla's statement as evidence that he would have rejected the plea and insisted on going to trial.

First, as we have discussed, *Lee* is not a magic-words test that allows a petitioner to utter the right phrase and automatically receive relief. Second, reading the transcript closely, we see that Bobadilla was not saying he would have rejected the plea and insisted on trial when he said, "I would take a different approach to that." Bobadilla made that statement in the context of questioning about whether he read the advisement of rights form, whether he trusted his attorney's advice that certain advisements were "not applicable" to him, and whether he would have

asked trial counsel about the immigration status advisement had it not been marked "N/A." Tr. pp. 16–17. Saying he would have reacted differently and taken a different approach to the advisement form does not equate to him saying he would have rejected the plea agreement altogether and insisted on a trial. Nevertheless, there is enough evidence in the record for us to draw conclusions about Bobadilla's special circumstances, particularly how they would have led him to reject a guilty plea resulting in deportation and to insist on going to trial.

At his guilty-plea hearing, Angelo Bobadilla was a teenager facing his "first criminal charge." Appellant's App. Vol. II, p. 22. Specifically, he faced four low-level misdemeanor charges that would likely not result in significant jail time, considering the many sentencing options available to trial courts. Bobadilla was gainfully employed. *Id.* He had lived in the United States since he was a young boy—at least ten years. Tr. pp. 19–20. During those ten years he requested and received the DACA benefit from the United States government. *Id.* at 17; Appellant's App. Vol. II, pp. 14, 96. With just these few facts, we conclude that Bobadilla's special circumstances revealed he had significant ties to the United States, not Mexico. Therefore, there is a reasonable probability that he would have rejected a guilty plea that could subject him to deportation and insisted on going to trial instead.[5]

To be sure, even if Bobadilla lost at trial, his counsel (a veteran attorney) likely could have secured a different sentence for his young, inexperienced client—a different outcome that would not expose Bobadilla to deportation. Remarkably, to avoid making his client

---

[5] We acknowledge, of course, "a defendant has no right to be offered a plea." *Missouri v. Frye*, 566 U.S. 134, 148 (2012) (citing *Weatherford v. Bursey*, 429 U.S. 545, 561 (1977) ("But there is no constitutional right to plea bargain.")). But we note that when offered a plea agreement, a defendant may reject an unfavorable agreement in hopes of securing a better one. For instance, had Bobadilla's counsel known his client's citizenship status, he could have tried to negotiate a different agreement with the prosecutor—one that did not implicate deportation. *See Padilla*, 559 U.S. at 373 ("[I]nformed consideration of possible deportation can only benefit both the State and noncitizen defendants during the plea-bargaining process" because "the defense and prosecution may well be able to reach agreements that better satisfy the interests of both parties.").

deportable, counsel would have only needed to convince the judge at sentencing to impose a sentence of 364 days rather than 365 days. Just one day would have taken deportation off the table for this young defendant. Given the wide array of sentencing alternatives available to this nineteen-year-old with no criminal history, it appears reasonable that he would've taken a chance at trial rather than enter a plea agreement that ensures deportation.

## Conclusion

Angelo Bobadilla's life instantly changed in drastic, unforeseen ways when he pleaded guilty to two misdemeanors in Hamilton County Superior Court 4. Though Indiana law considered young Bobadilla a misdemeanant deserving a second chance to live a law-abiding life, federal immigration law considered him a felon subject to deportation. Bobadilla petitioned for post-conviction relief when he learned he faced possible deportation because his trial counsel failed to properly advise him about the immigration consequences of a misdemeanor guilty-plea. The lower courts denied his petition, finding he did not prove he received ineffective assistance of counsel under *Strickland v. Washington*—deficient performance that prejudiced him.

We, however, agree with Bobadilla on both points. First, his attorney rendered constitutionally deficient performance as a matter of law by independently marking "N/A" next to the citizenship advisement on the standard advisement of rights form before inquiring into Bobadilla's citizenship status. Second, counsel's deficient performance prejudiced Bobadilla because the record reveals special circumstances demonstrating a reasonable probability that had Bobadilla been fully informed of his plea's consequences, he would have rejected it and insisted on trial.

For these reasons, we reverse the post-conviction court and remand for further proceedings consistent with this opinion.

Rush, C.J., and David, J., concur.
Massa, J., dissents with separate opinion in which Slaughter, J., joins.

**Massa, J., dissenting.**

The Court's analysis of our *Segura* precedent in the light of subsequent decisions of the United States Supreme Court is correct. But I respectfully part company in applying this updated standard to the facts of this sad case. Reversing a court on post-conviction requires that the facts and law point **unerringly** to a different outcome, *Campbell v. State*, 19 N.E.3d 271, 274 (Ind. 2014), and they don't on this record. There's enough factual and legal uncertainty that our deference must mean something and compel that the post-conviction court be affirmed.

The appellant presents a seductively sympathetic case at a time when the issue of illegal immigration convulses the nation—a DACA Dreamer in the country for most of his life who ends up deported for boosting a bag of boxers or briefs. As the Court notes, had Bobadilla pled to 364 days suspended (instead of 365!) he'd likely still be in Hamilton County with his family. It is thus an act of compassion that our Court performs today, giving Bobadilla a chance, however remote, of getting back in the country. But the near impossibility of that occurring makes this holding all the more questionable. His own lawyers call today's relief "meaningless."[1] We alter the rules with little chance that anyone will benefit. And that should be avoided by a court of legal doctrine.

---

[1] As Bobadilla noted in his "Emergency Motion to Correct Error and Request For Expedited Hearing on the Matter," his post-deportation prospects are dim. Appellant's App. Vol. 2, p.46 ("After removal from the U.S.[,] Bobadilla will have no effective immigration remedy [and] any subsequent favorable decision on this motion or on appeal will likely be meaningless."). Despite the vacatur of his conviction through post-conviction relief, Bobadilla may still risk possible prosecution for illegal reentry under Section 1326 of Title 8 of the United States Code, rendering him deportable and subject to removal. *See* 8 U.S.C. § 1326(b)(2). And Bobadilla's post-conviction DACA standing is unclear under the record. If Bobadilla—without being properly admitted or without being paroled (facilitating his entry into, and permitting him to temporarily remain in, the United States) by the Secretary of Homeland Security—enters the United States as a non-Dreamer, he may be "inadmissible" and subject to removal under Section 1182 of Title 8. *See* 8 U.S.C. §§ 1182(a)(6)(A), (d)(5)(A). *See also* 6 U.S.C. § 202 (transferring authority for immigration matters to the Secretary of Homeland Security). And, in any event, even if he successfully returns to the United States, Bobadilla could still be convicted at trial, lose his DACA status, and possibly be deported again.

The post-conviction court should be affirmed because Bobadilla presented insufficient **evidence** to sustain his burden of proof on both prongs of the *Strickland* test: deficient performance and prejudice.

Regarding deficient performance, we have in the dock a respected criminal defense attorney with three decades of experience. His client was nineteen, spoke perfect English and never gave the lawyer any reason to believe he was in the country illegally (and thus vulnerable to deportation if his negotiated sentence exceeded a particular threshold). But in order to find deficient performance, we today all but adopt a new standard for Indiana lawyers—that they ask their clients if they are citizens, whatever their age, surname, or fluency. That is a bridge too far, and we should not impose this duty to determine the citizenship status of every client on defense lawyers in every case. In attempting to do justice, we unfortunately, unintentionally, but unmistakably malign a lawyer whose only real mistake was in failing to notice a single entry on a jail booking sheet noting Mexico as his client's place of birth. This was an oversight, to be sure. Does it establish he was constitutionally deficient and ineffective as a matter of law when he negotiated a fully suspended sentence for his client? I don't believe so.

If we are to impose a requirement to inquire with or to advise unapparent non-citizens, the obligation should rest with our trial courts. Just as judges are required to inform defendants of other consequences of their guilty pleas under *Boykin v. Alabama*, 395 U.S. 238 (1969), so too can they be entrusted to advise defendants of those pleas' potential immigration consequences. Indeed, *Padilla* notes that, in addition to Kentucky, "many States require trial courts to advise defendants of

possible immigration consequences."[2] And, in the wake of *Padilla*, the federal rules of criminal procedure now require a District Court, before accepting a guilty plea, to "inform the defendant of, and determine that the defendant understands," that "if convicted, a defendant who is not a United States citizen may be removed from the United States, denied citizenship, and denied admission to the United States in the future." Fed. R. Crim. P. 11(b)(1)(O). There is no reason Indiana, like our federal brethren and several sister states, cannot provide this warning. This would be a better way to impose a new protection than retroactively declaring a competent lawyer ineffective.[3]

As for prejudice (if deficiency **were** established), the law as declared by the United States Supreme Court now requires a petitioner to prove that, had he been properly advised of deportation consequences, he would have gone to trial rather than plead guilty to otherwise favorable terms. *See Lee v. United States*, 137 S. Ct. 1958, 1965 (2017) ("[W]hen a defendant claims that his counsel's deficient performance deprived him of a trial by causing him to accept a plea, the defendant can show prejudice by demonstrating a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.") (internal quotation marks omitted). Petitioner here said no such

---

[2] *Padilla v. Kentucky*, 559 U.S. 356, 374 n.15 (2010) ("See, *e.g.*, Alaska Rule Crim. Proc. 11(c)(3)(C) (2009–2010); Cal. Penal Code Ann. § 1016.5 (West 2008); Conn. Gen. Stat. § 54–1j (2009); D.C. Code § 16–713 (2001); Fla. Rule Crim. Proc. 3.172(c)(8) (Supp. 2010); Ga. Code Ann. § 17–7–93(c) (1997); Haw. Rev. Stat. Ann. § 802E–2 (2007); Iowa Rule Crim. Proc. 2.8(2)(b)(3) (Supp. 2009); Md. Rule 4–242 (Lexis 2009); Mass. Gen. Laws, ch. 278, § 29D (2009); Minn. Rule Crim. Proc. 15.01 (2009); Mont. Code Ann. § 46–12–210 (2009); N.M. Rule Crim. Form 9–406 (2009); N.Y. Crim. Proc. Law Ann. § 220.50(7) (West Supp. 2009); N.C. Gen. Stat. Ann. § 15A–1022 (Lexis 2007); Ohio Rev. Code Ann. § 2943.031 (West 2006); Ore. Rev. Stat. § 135.385 (2007); R.I. Gen. Laws § 12–12–22 (Lexis Supp. 2008); Tex. Code. Ann. Crim. Proc., Art. 26.13(a)(4) (Vernon Supp. 2009); Vt. Stat. Ann., Tit. 13, § 6565(c)(1) (Supp. 2009); Wash. Rev. Code § 10.40.200 (2008); Wis. Stat. § 971.08 (2005–2006).").

[3] The trial court below is already providing this warning, to a degree, by placing a box to be checked by defense counsel in consultation with the client. But this allows for misunderstandings, as occurred in this case when the client failed to disclose his status to the lawyer. If the court reads the warning in the guilty plea colloquy, this danger is removed.

thing, but we decide for him anyhow.[4] What this means for future cases on post-conviction relief remains to be seen.

Slaughter, J., joins.

ATTORNEYS FOR APPELLANT
Kevin C. Muñoz
Muñoz Legal, LLC
Indianapolis, Indiana

John L. Tompkins
The Law Office of John L. Tompkins
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
Curtis T. Hill, Jr.
Attorney General of Indiana

Monika Prekopa Talbot
Supervising Deputy Attorney General
Indianapolis, Indiana

---

[4] The Court must **infer** that Bobadilla would have gone to trial, in the absence of any such assertion, in order to reach an admirable and equitable outcome when other government actors better suited than a court of last resort might have helped avoid this perfect storm, assuming there isn't more to this story. *See Sargent v. State*, 27 N.E.3d 729, 734–36 (Ind. 2015) (Massa, J., dissenting). An agreed sentencing modification, or forbearance by immigration officials, would have mooted the issue. *See* Ginger Thompson and Sarah Cohen, *More Deportations Follow Minor Crimes, Records Show*, N.Y. Times (Apr. 6, 2014), https://www.nytimes.com/2014/04/07/us/more-deportations-follow-minor-crimes-data-shows.html. It is fair to ask the authorities involved: did it have to come to this?