

ATTORNEY FOR APPELLANT

Cynthia M. Carter
Law Office of Cynthia M. Carter, LLC
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Jesse R. Drum
Caroline G. Templeton
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Harold Warren,

*Appellant-Petitioner,*

v.

State of Indiana,

*Appellee-Respondent*

April 8, 2020

Court of Appeals Case No.
19A-PC-1604

Appeal from the Marion Superior
Court

The Honorable Barbara Crawford,
Judge

The Honorable Steven Rubick,
Magistrate

Trial Court Cause No.
46G01-1708-PC-28299

**May, Judge.**

[1]     Harold Warren appeals the trial court's order denying his petition for

postconviction relief.  He argues his Sixth Amendment right to effective

assistance of counsel was infringed because his trial counsel failed to thoroughly investigate and present evidence implicating alternative suspects. We affirm.

# Facts and Procedural History[1]

Jack Dorfman operated a small business on Washington Street in Indianapolis, where he would purchase precious metals and cash checks. On January 7, 1999, a customer visited Dorfman's shop and found Dorfman lying dead on the floor from a gunshot wound. Police investigated the murder and subsequently arrested Harold Warren. On January 14, 1999, the State charged Warren with murder,[2] felony murder,[3] and Class A felony robbery.[4]

Warren filed a petition for writ of habeas corpus and admission to bail. At the hearing on the petition, Steve Jordan, the owner of a printing store located near Dorfman's shop, testified that on the morning of Dorfman's murder, a black pickup truck parked in the parking lot of his printing store. The truck remained running and an individual got out of the pickup truck and walked in the direction of Dorfman's shop.[5] The individual had medium-length hair, wore

---

[1] We heard oral argument in this case on February 3, 2020, at the University of Southern Indiana in Evansville. We commend counsel for their advocacy and thank the University of Southern Indiana's faculty, staff, and students for their attendance.

[2] Ind. Code § 35-42-1-1 (1997).

[3] Ind. Code § 35-42-1-1 (1997).

[4] Ind. Code § 35-42-5-1 (1984).

[5] Jordan did not testify regarding how many people were in the truck.

blue jeans with a leather jacket, and was "maybe five ten, somewhere in that neighborhood, dark hair, clean shaven, not very heavy, not real slender, just medium build." (Ex. AAA at 16.) When asked if the individual Jordan described matched Warren's appearance, Jordan answered, "Probably not." (*Id*. at 17.) Dana Roberson also testified at the hearing. She gave an incomplete report of her criminal history and confirmed that she had dated Larry Warren ("Larry"), Harold Warren's brother. She denied seeing Warren on the day of Dorfman's murder. After Roberson's brief background testimony, the court implored Warren's counsel, Carl L. Epstein, to "get to the point" and Epstein ceased his examination. (Ex. BBB at 41.) The court denied Warren's petition for bail.

[4] The court held a jury trial from February 7 through February 9, 2000. Epstein did not subpoena either Larry or Roberson to testify at the trial. The jury returned a verdict of guilty on all counts, and the court entered judgments of conviction for murder and Class B felony robbery,[6] which is a lesser-included offense of the Class A felony robbery charged. The court sentenced Warren to consecutive terms of sixty-five years for murder and twenty years for robbery, for an aggregate executed term of eighty-five years in the Indiana Department of Correction.

---

[6] Ind. Code § 35-42-5-1 (1984).

[5]     On direct appeal, our Indiana Supreme Court[7] summarized the evidence presented to the jury during Warren's trial:

> [T]he victim, Jack Dorfman, the proprietor of a small Indianapolis store that purchased and sold jewelry and precious metals and cashed checks, was killed by a single .22 caliber gunshot wound to the head, probably fired from a revolver. Three days after the murder, Paul Fancher had purchased a .22 caliber revolver from the defendant's brother, Ron Warren, who had obtained it from one of his brothers. After learning that the defendant had been arrested for the murder, Fancher turned the gun over to police. On the day before the murder, the defendant had been in Dorfman's store to sell some rings. After Dorfman declined and directed that the defendant be escorted out of the shop, the defendant told him: "I'll be back." The defendant admitted to police that he was in Dorfman's store on the day of the murder. After the murder, the defendant's fingerprints were discovered on a pawn ticket found on the counter of the shop, and yet the defendant told police that he never could have left his thumbprint on a pawn card because he had never pawned anything. On the day of the murder, the defendant used Dorfman's credit cards at a liquor store, a Meijer store, a K-Mart store, and a Radio Shack store.

*Warren v. State*, 757 N.E.2d 995, 999 (Ind. 2001). The Supreme Court affirmed Warren's convictions. *Id*. at 1001.

[6]     Warren filed a petition for postconviction relief on July 13, 2017. The petition alleged Warren's trial counsel, Epstein, provided constitutionally ineffective

---

[7] At the time, the appellate rules allowed for a direct appeal to the Indiana Supreme Court because Warren was sentenced to a term of greater than fifty years for a single offense. *See* Ind. Appellate Rule 4(A)(7) (1999).

assistance because he "failed to present crucial defense evidence, failed to hire or consult expert witnesses, and failed to interview and subpoena key defense witnesses." (App. Vol. II at 9-10.) The postconviction court held an evidentiary hearing, conducted over four non-consecutive days, on Warren's petition. Epstein testified at the postconviction hearing.[8] Epstein acknowledged he was not able to invest as much time into preparing Warren's case as he would have liked because he expended a lot of time and resources preparing and trying a multi-week federal criminal trial, which concluded shortly before Warren's trial, and because his medical problems, including Type 2 diabetes and a heart problem, limited the amount of time Epstein could devote to preparing for Warren's trial. Epstein testified that if he had had more time, he would have taken Roberson's deposition. Epstein did not talk with Roberson informally or take a taped statement from her before Warren's trial. Epstein acknowledged receiving Indianapolis Police Department[9] inter-department communications about fingerprint evidence in the Dorfman murder, and he testified that he should have used the evidence in his arguments at Warren's trial.[10]

---

[8] Epstein's bar license is currently suspended without automatic reinstatement. (Tr. Vol. II at 15.)

[9] Currently, the department is known as the Indianapolis Metropolitan Police Department. However, at the time of the investigation into the Dorfman murder, the department was known as the Indianapolis Police Department.

[10] During Warren's examination of Epstein at the post-conviction hearing, Warren marked as an exhibit and questioned Epstein about Indianapolis Police Department inter-department communications regarding the fingerprint evidence in the Dorfman murder. These inter-department communications were offered but not admitted as evidence at the postconviction hearing.

[7]     Sergeant Michael Knapp of the Indianapolis Metropolitan Police Department also testified at the postconviction evidentiary hearing. Sergeant Knapp analyzed the latent fingerprint evidence officers collected in connection with the Dorfman murder. Sergeant Knapp received a pawn ticket with an inked fingerprint on it and latent fingerprints from the scene of the murder. Sergeant Knapp determined that Aaron Gill's fingerprints matched latent fingerprints recovered from the murder scene. A crime scene technician recovered those latent fingerprints from the side of a clear cellophane bag found in the backroom of Dorfman's shop. Sergeant Knapp compared the other latent prints to Warren's fingerprints, and he determined the latent prints did not belong to Warren. However, Sergeant Knapp determined the inked print on the pawn ticket did belong to Warren.

[8]     Larry testified at the postconviction relief hearing that he and Roberson were dating and living together at the time of Dorfman's murder. On the morning of Dorfman's murder, Larry awoke about 8:30 am and found Roberson was not home. Roberson returned to their residence at approximately 12:30 pm. Larry testified that Roberson had multiple conversations with law enforcement in the days after the Dorfman murder. Police officers came to their home and questioned them about three days after Dorfman's murder, and a detective left with Roberson. Larry testified that in the days following Dorfman's murder, Roberson appeared "very anxious." (Tr. Vol. II at 79.) He also testified she suddenly had a lot of money. Roberson used cash to purchase a recreational

vehicle, had her black pickup truck painted grey, and took herself and Larry to Florida.

[9] Warren subpoenaed Roberson to appear at the evidentiary hearing. However, Roberson did not appear at the first two days of the evidentiary hearing. Roberson testified on the third day, but her testimony was suspended so she could consult with an attorney. During her brief testimony, Roberson confirmed that she spoke with Detective Alan Jones of the Indianapolis Police Department about Warren. She also confirmed that she did not speak with Epstein before Warren's trial, other than when she testified in connection with Warren's petition for bail. Roberson was called to testify on the fourth day of the postconviction evidentiary hearing, after the court appointed her counsel, but on the advice of counsel, she invoked her right against self-incrimination under the Fifth Amendment to the United States Constitution and did not provide further testimony. Warren also testified at the post-conviction hearing that he believed Epstein should have done more to investigate his case. He stated that he wanted Epstein to talk to Roberson and Larry in preparing his defense.

[10] On June 12, 2019, the postconviction court issued an order with findings of fact and conclusions of law denying Warren's petition. The postconviction court concluded:

> Here [Warren] has raised the barest inference of Ms. Roberson being associated with this crime and, more importantly in this context, [Warren] has pointed to no material evidence which

directly connects Ms. Roberson to the crime or the crime scene. Without substantially more evidence, this Court cannot draw any rational inference connecting the murder and the alleged repainting of the truck, or connecting Dana Roberson's possession of an indeterminate amount of money at an indeterminate point in time. Lacking this, this Court does not find that trial counsel was ineffective for failing to subpoena Dana Roberson at trial or in failing to further develop her as an alternate suspect.

(Appellant's App. Vol. II at 121.) Additionally, the postconviction court concluded Epstein was not ineffective for failing to present Aaron Gill as an alternate suspect because, other than Gill's fingerprints being present at the crime scene, there was no other material evidence connecting Gill to Dorfman's murder. The postconviction court also pointed out that Epstein raised the specter of an alternative suspect, though not Roberson or Gill, when cross-examining Detective Jones during Warren's criminal trial.

# Discussion and Decision

[11] The petitioner for postconviction relief must establish that he is entitled to relief by a preponderance of the evidence. *Timberlake v. State*, 753 N.E.2d 591, 597 (Ind. 2001), *reh'g denied*, *cert. denied* 537 U.S. 839 (2002). "Because he is now appealing a negative judgment, to the extent his appeal turns on factual issues, [the petitioner] must convince this Court that the evidence as a whole leads unerringly and unmistakably to a decision opposite that reached by the postconviction court." *Id.* "Where the [postconviction] court has entered findings of fact and conclusions of law, we accept the findings of fact unless

clearly erroneous, but accord no deference [to] conclusions of law." *Turner v. State*, 974 N.E.2d 575, 581 (Ind. Ct. App. 2012), *trans. denied*. We will reverse the postconviction court's decision only if the evidence is without conflict and leads to a conclusion opposite that reached by the postconviction court. *Id*. at 581-82.

## Ineffective Assistance of Counsel

[12] If not raised on direct appeal, a criminal defendant may raise a claim of ineffective assistance of counsel in a postconviction relief petition. *Timberlake*, 753 N.E.2d at 597. The Sixth Amendment to the United States Constitution provides that in all criminal prosecutions, a defendant is entitled "to have the assistance of counsel for his defense." U.S. Const., Am. VI. This requires counsel's assistance be effective. *Strickland v. Washington*, 466 U.S. 668, 686 (1984), *reh'g denied*. There is a strong presumption that trial counsel provided effective representation, and a petitioner must put forth strong evidence to rebut that presumption. *McCullough v. State*, 973 N.E.2d 62, 74 (Ind. Ct. App. 2012), *trans. denied*. "Isolated poor strategy, inexperience, or bad tactics does not necessarily constitute ineffective assistance of counsel." *Id*. Rather, a petitioner must show that trial counsel's performance was deficient, and the petitioner was prejudiced by the deficiency. *Id*. at 75.

> When evaluating a defendant's ineffective-assistance-of-counsel claim, we apply the well-established, two-part *Strickland* test. The defendant must prove: (1) counsel rendered deficient performance, meaning counsel's representation fell below an objective standard of reasonableness as gauged by prevailing

professional norms; and (2) counsel's deficient performance prejudiced the defendant, i.e., but for counsel's errors the result of the proceeding would have been different.

*Bobadilla v. State*, 117 N.E.3d 1272, 1280 (Ind. 2019) (internal citation omitted).

# 1. Counsel's Performance

## *A. Investigation of Roberson as Alternative Suspect*

[13] Warren argues his trial counsel, Epstein, was ineffective because Epstein did not thoroughly investigate Roberson as an alternative suspect. An attorney "has a duty to make a reasonable investigation or to make a reasonable decision that the particular investigation is unnecessary." *Ritchie v. State*, 875 N.E.2d 706, 719-720 (Ind. 2007). We give considerable deference to trial counsel's strategic and tactical decisions, but "in order to make a reasonable tactical decision, counsel must have adequately investigated the client's case because 'strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.'" *Conner v. State*, 711 N.E.2d 1238, 1248 (Ind. 1999) (quoting *Strickland*, 466 U.S. at 690-91), *cert. denied* 531 U.S. 829 (2000).

[14] Warren argues Epstein was delinquent in not pursuing discovery in order to obtain evidence of Roberson's bad character and should have further investigated the theory that Roberson murdered Dorfman. Even though Epstein moved to compel the State to disclose Roberson's criminal history and related information, Epstein filed a motion *in limine* seeking to exclude Roberson's testimony before receiving the requested discovery. The requested

discovery would have shown that Roberson was charged with Class D felony theft[11] in 1992 and had two misdemeanor theft convictions. The police spoke with Roberson after Dorfman's murder, and Warren contends that he was arrested as a result of information Roberson gave the police.

[15] Warren contends Epstein provided deficient performance by not investigating Roberson more thoroughly and by failing to subpoena her. Epstein thought the individual described by Jordan in his testimony at the bail hearing could have been Roberson because she owned a black pickup truck and had the same build as a small man. Epstein testified that "[p]erhaps [he] hadn't done a good enough job in terms of investigating Ms. Roberson." (Tr. Vol. II at 25.) Epstein also admitted at the postconviction hearing that he "kn[e]w or ha[d] reason to believe" Roberson was a "fence."[12] (*Id.* at 43.)

[16] Additionally, Warren argues Epstein should have interviewed Larry or subpoenaed him to be a witness. Larry testified at the postconviction relief hearing that he lived with Roberson at the time of Dorfman's murder, that Roberson's whereabouts at the time of the murder were unknown, that she had her truck painted shortly after the murder, that she came into a large amount of cash after the murder, and that they left for Florida after the murder. Larry also

---

[11] Ind. Code § 35-43-4-2 (1986).

[12] "Fence" is a colloquial term used to refer to "a receiver of stolen goods." *Fence*, Merriam-Webster https://www.merriam-webster.com/dictionary/fence [**https://perma.cc/EMS4-BXNP**].

testified at the postconviction relief hearing that he believed Roberson had multiple conversations with law enforcement concerning the Dorfman murder and that she was trying to deflect blame from herself to Warren. Therefore, Warren argues Epstein was ineffective because he did not adequately question Larry in order to find out what Larry knew about the circumstances surrounding the crime.

[17] The State maintains that Epstein was not ineffective because the evidence pointing to Roberson as an alternative suspect was inadmissible. As our Indiana Supreme Court has explained:

> Evidence of a third-party motive tends [to make] it less probable that the defendant committed the crime, and is therefore relevant under Rule of Evidence 401. *Joyner v. State,* 678 N.E.2d 386, 389 (Ind. 1997). However, this evidence may be excluded if its probative value is out-weighed by unfair prejudice, confusion of the issues, or the potential to mislead the jury. Ind. Evid. R. 403. In the context of third-party motive evidence, these rules are grounded in the widely-accepted principle that before evidence of a third party is admissible, the defendant must show some connection between the third party and the crime. *See Holmes v. South Carolina,* 547 U.S. 319, 327 & n. *, 126 S. Ct. 1727, 164 L.Ed.2d 503 (2006) (listing jurisdictions and quoting 41 C.J.S., Homicide § 216, at 56-58 (1991) ("Evidence tending to show the commission by another person of the crime charged may be introduced by accused when it is inconsistent with, and raises a reasonable doubt of, his own guilt; but frequently matters offered in evidence for this purpose are so remote and lack such connection with the crime that they are excluded.")).

*Pelley v. State*, 901 N.E.2d 494, 505 (Ind. 2009), *reh'g denied*; *see also Lashbrook v. State*, 762 N.E.2d 756, 758 (Ind. 2002) (holding trial court did not abuse discretion in excluding evidence that a third party made threatening comments because there was no material evidence connecting the third party to the crime). The State argues the evidence concerning Roberson presented at the postconviction hearing would not have been admitted at Warren's trial because the evidence is speculative and does not directly connect Roberson to the crime.

[18]    However, while the evidence does not directly link Roberson to the crime, it raises several red flags. Had Epstein interviewed Larry, he would have discovered substantial information that casts suspicion on Roberson. Epstein then could have deposed, interviewed, or subpoenaed Roberson. He could have asked her where she was the morning of the murder, how many conversations she had with law enforcement about the murder, how she was able to purchase the recreational vehicle, why she decided to take a trip to Florida with Larry shortly after the murder, whether she repainted her truck grey, and if so, why she repainted her truck. Roberson might have invoked her Fifth Amendment right against self-incrimination, denied Larry's allegations, or provided innocent explanations, but Epstein did not find out. Therefore, we agree with Warren that Epstein's performance was deficient regarding his investigation of Roberson. *See Siglar v. State*, 541 N.E.2d 944, 946 (Ind. 1989) ("Failure to interview defense witnesses prior to trial may constitute ineffective assistance if it appears that such interviews would have produced something substantive.").

## B. Fingerprint Evidence

[19] Warren also contends Epstein was ineffective because he failed to utilize exculpatory fingerprint evidence. Specifically, Warren alleges "Mr. Epstein failed to present evidence that fingerprints belonging to Aaron Gill, Gallery No. 470350, were found on cellophane in the backroom of Mr. Dorfman's shop near his body. Mr. Epstein was aware of this evidence but inexplicably failed to use it." (Appellant's Br. at 24) (internal citations omitted). At the postconviction hearing, Epstein testified:

> Aaron Gill I might have suggested as an alternative suspect and I might have requested more specific discovery pertaining to his whereabouts on the occasion and any number of other things that might have suggested somebody other than Mr. Warren shot Mr. Dorfman.

(Tr. Vol. II at 36.)

[20] Warren cites *Fisher v. State*, in which Fisher's trial counsel failed to present at trial evidence that had been elicited during Fisher's juvenile waiver hearing about three potential witnesses who failed to identify Fisher in a lineup. 878 N.E.2d 457, 464 (Ind. Ct. App. 2007), *trans. denied*. We held Fisher's trial counsel's failure to elicit such testimony did not constitute deficient performance or prejudice Fisher because Fisher's trial counsel introduced evidence on cross examination that one of the potential witnesses failed to identify Fisher in a lineup and Fisher's trial counsel cross-examined the victim regarding her identification of Fisher. *Id.* We also held Fisher's trial counsel's failure to elicit testimony that officers were unable to lift fingerprints from the

victim's doorknob or telephone did not prejudice Fisher because those items were routinely handled by multiple persons, making it difficult to lift fingerprints off of them. *Id*. at 465.

[21] Warren also cites *Miller v. State*, in which Miller argued that his trial counsel was ineffective because he failed to identify and elicit testimony from a shoe and tire print examiner that the shoe and tire prints found at the scene of a murder did not match Miller's shoes or his vehicle's tires. 702 N.E.2d 1053, 1063-64 (Ind. 1998), *reh'g denied*, *cert. denied* 528 U.S. 1083 (2000). Our Indiana Supreme Court held Miller's trial counsel's performance was not deficient and did not prejudice Miller because the State elicited testimony from a police officer that soil samples could not be connected with Miller's car or shoes. *Id*. at 1064.

[22] Warren argues his case is different from both *Fisher* and *Miller* because Epstein did not introduce evidence of Gill's prints through the State's witnesses. The State maintains the fingerprint evidence was inadmissible because there is no evidence besides the presence of Gill's fingerprints on a bag in the shop that connects Gill to the robbery and murder. The State also argues it is not surprising that someone else's fingerprints would be found on cellophane wrap in Dorfman's store given the nature of Dorfman's business. Nonetheless, we hold the possible presence of someone other than Warren at the crime scene is a lead worth investigating because it suggests a possible alternative perpetrator. *See Shuemak v. State*, 258 N.E.2d 158, 159 (Ind. 1970) (noting "it is universally

recognized a finger, palm, or bare footprint found in the place where a crime was committed may be sufficient proof of identity").

## 2. Probability of Different Outcome

[23] Having determined that trial counsel's performance was deficient, we must evaluate whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. In effect, Warren must show his trial counsel's failures were so prejudicial they denied him a fair trial. *Turner v. State*, 669 N.E.2d 1024, 1027 (Ind. Ct. App. 1996), *reh'g denied*, *trans. denied*.

[24] The State presented substantial evidence implicating Warren. Warren used Dorfman's credit cards on the day of the murder. Warren went into Emerson Liquors on January 7, 1999, and purchased alcohol and cigarettes using one of Dorfman's credit cards. He also used Dorfman's credit cards at a Meijer store and a Kmart store. Moreover, he tried to purchase items at a Radio Shack store with Dorfman's credit cards. Even before Warren presented Dorfman's credit card, the Radio Shack employees were suspicious because Warren's interest jumped from item to item, and Warren put the hood of his jacket up over his head when he saw a visible camera outside the restroom. When Dorfman's card was declined, Warren threw down another credit card that belonged to Dorfman for the clerk to try. Warren left the store without taking the credit cards with him, without completing a purchase and without waiting for the cashier to try the second card. Also, the day before the murder, Warren had

been in Dorfman's shop and announced he would "be back" as he was escorted out of the shop. *Warren*, 757 N.E.2d at 999.

[25] Warren's inked fingerprint was found on a pawn card at the scene of the murder, and no other pawn cards with inked fingerprints on them were found at the scene. Dorfman's friend Craig Cross testified that Dorfman would not leave completed pawn cards lying around his store, and he would generally mail the pawn cards to the Indianapolis Police Department within a day of receiving them. Detective Alan Jones interrogated Warren after Dorfman's murder. Warren admitted visiting Dorfman's store. Warren told Detective Jones

> that as he was leaving the store he slipped on the ice and when he fell he found a plastic bag containing credit cards and some gold. [Detective Jones] asked him specifically what he did with the credit cards and he said that he threw them away. [Detective Jones] then asked him if he had used them at all and he said that he had not, that that was illegal.

(Prior Case-Record of Proceedings Vol. III at 687.) Warren denied ever pawning anything at Dorfman's store or filling out a pawn card.

[26] Additionally, a .22 caliber gun killed Dorfman, and Paul Fancher bought a .22 caliber revolver from one of Warren's brothers shortly after the murder. Also, notably, while the evidence revealed at the post-conviction relief hearing potentially implicates other individuals, it does not exonerate Warren. Even though Warren's trial counsel's performance was deficient, he has failed to show a reasonable likelihood the result of his trial would have been different.

Therefore, we hold he is not entitled to post-conviction relief. *See Williams v. State*, 706 N.E.2d 149, 156 (Ind. 1999) (holding even if defendant's trial attorneys would have more thoroughly investigated blood evidence, they would not have been able to present information to the jury significantly different from that provided by the State's witnesses), *reh'g denied*, *cert. denied* 529 U.S. 1113 (2000).

# Conclusion

Warren's trial counsel acknowledges he did not adequately investigate a potential alternative suspect or follow-up on a lead that another individual's fingerprints were present at the scene of Dorfman's murder. However, despite trial counsel's deficient performance, we cannot say there was a reasonable probability the outcome of Warren's trial would have been different because of the overwhelming evidence of Warren's guilt presented at trial. We accordingly affirm.

Affirmed.

Bailey, J., and Brown, J., concur.