

IN THE

# Court of Appeals of Indiana

Kerry Silvers,

*Appellant-Petitioner*

v.

State of Indiana,

*Appellee-Respondent*



FILED

Jan 31 2025, 9:12 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

January 31, 2025

Court of Appeals Case No.
24A-PC-277

Appeal from the Lawrence Superior Court

The Honorable Robert R. Cline, Judge

Trial Court Cause No.
47D02-1909-PC-001834

**Opinion by Judge Felix**
Judges Pyle and Weissmann concur.

**Felix, Judge.**

## Statement of the Case

More than nine years after he was convicted of burglary, robbery, and carjacking, Kerry Silvers filed a petition for post-conviction relief ("PCR"), alleging he received ineffective assistance of trial counsel. Approximately 12 years later, an evidentiary hearing on Silvers's amended PCR petition was held, and the PCR court denied the petition. Silvers now appeals, raising six issues for our review that we revise and restate as the following two issues:

1. Whether the PCR court erred in determining Silvers's PCR claims are barred by laches; and
2. Whether the PCR court erred by denying Silvers's PCR petition.

Even though we disagree with the PCR court's decision on laches, we conclude Silvers failed to meet his burden of showing he is entitled to post-conviction relief on any of his claims; therefore, we affirm.

## Facts and Procedural History

Initially, we review the facts of Silvers's underlying offenses, trial, conviction, and direct appeal. We then summarize the facts pertaining to Silvers's PCR claims. Additional facts are included in the Discussion section as necessary.

### The Crime, Trial, Sentencing, and Direct Appeal

In July 1997, Ronald and Leesa Craig were living in Lawrence County, Indiana. They owned a convenience store named Mr. C's that was located approximately three miles from their house. At approximately 11:00 p.m. on

July 27, 1997, Ronald stopped by Mr. C's to get money from the store's safe. Ronald's employee Terry Bultman Jr., who was working at that time, saw Ronald leave the store with a bag of money. Thereafter, Ronald went home and fell asleep in his and Leesa's bedroom.

[5] At approximately 4:00 a.m. on July 28, Leesa was in the bathroom when the bathroom door was kicked open and two armed and partially masked men entered. One of the men was taller and stockier and the other man was shorter and slighter. The larger man had "light colored eyes" and "very fair, light skin[]," and the smaller man had a "darker complexion, almost like an olive complexion." DA Tr. Vol. I at 43.[1] The larger man was later identified as Silvers, and the smaller man was identified as Stephen Scott Craig[2] ("Scott").

[6] Scott and Silvers grabbed Leesa and knocked her to the floor. When Leesa started screaming, Scott and Silvers "kept yelling at" her and "holding [her] down," telling her "if [she] didn't lay still they were going to blow [her] f[*]ckin' brains out." DA Tr. Vol. I at 31. All the noise woke up Ronald, who grabbed his shotgun and entered the bathroom. Ronald aimed his shotgun at Scott, demanding he release Leesa. Scott yelled at Ron that if he did not put down the shotgun and come into the bathroom, Scott, who was pointing his handgun

---

[1] Silvers's trial transcript was filed with this court before his direct appeal was dismissed. Citations to that transcript use the abbreviation "DA" to denote it is from Silvers's direct appeal.

[2] Scott is not related to Ronald, but he is a distant relative of Leesa by marriage.

at Leesa, would "blow her f[*]cking head off." *Id.* at 79. Ronald complied with Scott's demands.

[7] Scott and Silvers "beat[] and knock[ed] around" Ronald and taped him up. DA Tr. Vol. I at 36. Silvers then held a gun on both the Craigs' heads while Scott went into the Craigs' bedroom and rummaged through their things. Scott and Silvers repeatedly asked the Craigs where their money was, and Silvers "kept telling [Scott] to hurry up." *Id.* When Scott was going through the Craigs' closet, Silvers called Scott by name.

[8] Throughout the encounter, both Scott and Silvers called Ronald by name and "specifically asked for the safe drop key for the safe drop" at Mr. C's. DA Tr. Vol. I at 40. The Craigs used the terms "safe drop" and "safe drop key" with the employees at Mr. C's in reference to the trap door on the store's safe. Those employees also knew that Ronald was the only person who handled the store's money and possessed the safe drop key. Ronald gave Silvers his key rings, and Silvers had Leesa identify the safe drop key; when he did this, Silvers took off his sunglasses, which allowed Leesa to see his eyes and skin color. Because Leesa rarely handled money for Mr. C's, she did not identify the correct key, and when Scott and Silvers had Ronald confirm Leesa chose correctly, Ronald knew she did not but told Scott and Silvers that she had.

[9] As Scott was going through the Craigs' belongings in their bedroom, he found Ronald's revolver. Scott also had Silvers give Leesa her purse so she could get cash out of it for them.

[10] When Scott and Silvers were ready to leave the Craigs' house, they made the Craigs give them a key to a vehicle; the Craigs identified the key on Ronald's keyrings that went to his diesel Ford pickup truck, "which was pretty loud," DA Tr. Vol. I at 97. Silvers, who had been holding a gun on and making verbal threats to the Craigs during the entire encounter, switched off with Scott while he went to make sure the identified key would start the truck. While Silvers was doing this, Scott "kept yelling at [the Craigs] the whole time with the gun to lay still or he was going to kill [them] if [they] tried to get up." *Id.* at 51. The Craigs heard Ronald's truck start and idle for a bit before Silvers returned, and he and Scott restrained the Craigs with duct tape. Before leaving, Scott and Silvers warned the Craigs "that if [they] try to escape, if [they] try to do anything for forty-five (45) minutes they'll kill [them]." *Id.* Scott and Silvers left the Craigs' house with cash, Ronald's revolver, and what they believed was the safe drop key.

[11] The Craigs waited until they could no longer hear Ronald's truck to remove the duct tape from their ankles. Then, they drove to a family member's house to call 911.

[12] As the investigation progressed throughout the day, law enforcement identified Scott and Silvers as possible suspects in the Craig robbery. Shortly before midnight on July 28, Silvers was driving his mother's vehicle with Scott in the front passenger seat in Bloomington when they were stopped by law enforcement; both men were subsequently arrested. Officers impounded

Silvers's mother's vehicle, and on July 29, 1997, an Indiana State Police crime scene technician searched that vehicle without a warrant.

[13] On July 30, 1997, the State charged Silvers with robbery,[3] burglary,[4] and carjacking,[5] all as Class B felonies. On August 8, 1997, John Plummer III was appointed as Silvers's public defender, and Plummer represented Silvers through sentencing. The State later amended the burglary charge to a Class A felony. Plummer did not object to this amendment.

[14] On May 26, 2000, two weeks before Silvers was to stand trial, he escaped from the Lawrence County jail. On June 18, 2000, Silvers was recaptured and returned to jail.

[15] In early April 2001, Silvers's jury trial was held. Bultman, the store clerk, testified that he knew Scott and Silvers because they would come in Mr. C's while he was working. According to Bultman, approximately three weeks before Scott and Silvers robbed the Craigs, they talked to Bultman about robbing Mr. C's. Scott and Silvers asked Bultman where Ronald lived, if he had a security system in his house, whether the security cameras at Mr. C's worked and what parts of the store they captured, and how the store's money was handled. Bultman answered all their questions to the best of his

---

[3] Ind. Code § 35-42-5-1 (effective 1984 to June 30, 2014).

[4] *Id.* § 35-43-2-1 (effective 1982 to June 30, 1999).

[5] *Id.* § 35-42-5-2 (effective 1993 to June 30, 2014).

knowledge, including informing them that Ronald was the only person who had a key to and retrieved money from the safe drop box. Scott and Silvers told Bultman that "they had everything in the car that they needed," DA Tr. Vol. I at 147, and were "going to go to [Ronald's] house, take whatever they wanted there and then come back to the store" and rob it, too, *id.* at 148. Additionally, Scott and Silvers told Bultman that if they robbed Mr. C's, Bultman should call law enforcement after they leave and say that two men had robbed the store, he did not have a description of them, and he did not know in which direction they left. Bultman did not tell anyone about his conversation with Scott and Silvers until he was questioned by law enforcement officers a few hours after Scott and Silvers robbed the Craigs' house.

[16] One of Silvers's fellow inmates in the Lawrence County jail testified that just days after the robbery, Silvers and Silvers' brother Kerby gave him handwritten notes with instructions on how to find the items stolen from the Craigs, how to find the items used in the robbery, and how to dispose of all those items. The notes, which the inmate turned over to law enforcement, led an officer directly to the items described therein. Plummer stipulated during trial that Silvers wrote two of the notes and Kerby wrote the other one.

[17] Danny Pfleider testified on Silvers's behalf, claiming he saw Scott and another man who was not Silvers at Mr. C's the night of the robbery. Pfleider also testified that he was high the night of the robbery and was incarcerated at the time of Silvers's trial for dealing LSD to school children.

The jury convicted Silvers as charged. In January 2002, the trial court sentenced Silvers to 55 years of incarceration. In February 2002, Silvers initiated a direct appeal regarding his conviction and sentence.[6] On April 18, 2002, Silvers escaped from custody for a second time. Due to this escape, in July 2002, his direct appeal was dismissed.

**PCR Proceedings**

Silvers was eventually recaptured in Mexico and returned to incarceration in Indiana. On November 18, 2010, Silvers filed a PCR petition. In December 2011, a State Public Defender was appointed to represent Silvers. The State Public Defender took no court-related action on the case for more than seven years. On September 12, 2019, Silvers filed a pro se appearance, a motion to remove counsel of record, and a motion to amend his PCR petition. The PCR court withdrew the State Public Defender's appearance, Silvers proceeded pro se with his amended petition, and he and the State engaged in discovery and motion practice. On April 9, 2020, Silvers filed his second amended PCR petition.

In October 2020, less than one month before the evidentiary hearing on his PCR petition, Silvers requested the appointment of a public defender again, which the PCR court granted. The State Public Defender filed an appearance soon thereafter and filed a motion to vacate the November 2020 evidentiary

---

[6] Cause 47A05-0202-CR-72.

hearing.  The PCR court granted the motion to vacate, and there was no more activity in the case until 2023.

[21] On April 27, 2023, a third amended PCR petition was filed.  The State, in response, denied the allegations and asserted three affirmative defenses:  (1) waiver, (2) laches, and (3) unreasonable delay.

[22] On September 27, the PCR court held an evidentiary hearing on Silvers's PCR petition.  During Silvers's case-in-chief, he called two witnesses:  his prior defense attorney and himself.  Plummer testified about his work on Silvers's case.  Plummer testified that he met with Silvers regularly at the jail where Silvers was awaiting trial and that Silvers was more involved in developing strategy for the case than other defendants he represented.  When questioned about specific decisions he made in Silvers's case, Plummer could not recall many of the reasons behind those decisions due to the passage of time.  In particular, Silvers's trial occurred more than 20 years before the PCR evidentiary hearing; Plummer, who now serves as a trial court judge in Lawrence County, had "handled probably ten thousand . . . cases since then," Tr. Vol. II at 17; and Plummer no longer had Silvers's case file.  Plummer was primarily only able to testify about his general practice and strategy regarding the types of decisions he was questioned about.

[23] On January 8, 2024, the PCR court issued its order denying Silvers's PCR petition.  In particular, the PCR court determined that Silvers's claims were

barred by laches and that he had failed to demonstrate Plummer provided ineffective assistance of counsel. This appeal ensued.

## Discussion and Decision

[24] We first address whether the trial court erred by determining the doctrine of laches barred Silvers's PCR claims. We then address whether the trial court erred by determining Silvers failed to demonstrate he was entitled to relief on the merits of his PCR claims.

### 1. The Trial Court Erred in Determining that Silvers's PCR Claims Are Barred by Laches

[25] Silvers contends the post-conviction court erred by determining the doctrine of laches barred his PCR claims. The PCR court made the following relevant findings and conclusions regarding the State's affirmative defense of laches:

> The amount of time it took for Silvers to seek relief under the claim of ineffective assistance of counsel was unreasonable and excessive under circumstances requiring diligence. Silvers waited nearly 20 years after the conclusion of his trial to raise the issue of ineffective assistance of counsel, despite having access to and consultations with multiple court-appointed attorneys during his incarceration. Silvers'[s] two escapes from jail and the years that he was missing, living in Mexico, added to the amount of time that it took him to raise the issue. This unfairly prejudiced the State because Plummer could no longer remember the details of his trial strategies or his negotiations with opposing counsel and could only speak in general terms.
>
> . . . Silvers is a sophisticated, intelligent inmate, who admittedly has spent lots of time in the prison law library, since he has been

incarcerated for "most of his life." . . . Silvers should have known that it was unreasonable and prejudicial to wait an extensive amount of time before raising an issue that he knew about and could have raised many years ago.

Appellant's App. Vol. VI at 45–46.

> This Court finds that Silvers'[s] delay in seeking Post-Conviction Relief was unreasonable, that Silvers had knowledge of the alleged defects in his conviction and means to seek relief, that he had consulted with attorneys, and that he was incarcerated in a penal institution with legal facilities. The Doctrine of Laches applies in this case and Silvers has demonstrated an unreasonable delay.

*Id.* at 49.

[26] Laches is an equitable doctrine that, when applicable, bars a party from seeking relief. *Foster v. First Merchants Bank, N.A.*, 235 N.E.3d 1251, 1256 (Ind. 2024) (citing *SMDfund, Inc. v. Fort Wayne-Allen Cnty. Airport Auth.*, 831 N.E.2d 725, 729 (Ind. 2005)). For laches to apply in the post-conviction context, the State must prove by a preponderance of the evidence that (1) the petitioner unreasonably delayed in seeking relief and (2) the State is prejudiced by the delay. *Armstrong v. State*, 747 N.E.2d 1119, 1120 (Ind. 2001) (citing *Williams v. State*, 716 N.E.2d 897, 901 (Ind. 1999)). It is often repeated that "[f]or post-conviction laches purposes, prejudice exists when the unreasonable delay operates to materially diminish a reasonable likelihood of successful re-prosecution." *Id.* (citing *Stewart v. State*, 548 N.E.2d 1171, 1176 (Ind. Ct. App. 1990)).

Because the State has the burden of proving laches as an affirmative defense, Silvers is not appealing from a negative judgment, and we review the post-conviction court's ruling on laches for clear error. *Armstrong*, 747 N.E.2d at 1120 (citing Ind. Trial Rule 52(A); *Spranger v. State*, 650 N.E.2d 1117, 1119 (Ind. 1995), *abrogated in part on other grounds by McIntire v. State*, 717 N.E.2d 96, 102 (Ind. 1999)). As our Supreme Court has explained:

> This is a review for sufficiency of evidence. *Estate of Reasor v. Putnam County*, 635 N.E.2d 153, 158 (Ind. 1994). Without reweighing the evidence or assessing the credibility of witnesses but rather looking only to the evidence and reasonable inferences favorable to the judgment, we will affirm if there is probative evidence to support the post-conviction court's judgment. *Williams*, 716 N.E.2d at 901; *Lacy v. State*, 491 N.E.2d 520, 521 (Ind. 1986).

*Armstrong*, 747 N.E.2d at 1120.

Silvers argues that the State failed to prove by a preponderance of the evidence both that he unreasonably delayed seeking relief and that the State was prejudiced by that delay. Even if we assume arguendo that the State proved by a preponderance of the evidence that Silvers unreasonably delayed in seeking post-conviction relief, we agree with Silvers that the State did not prove by a preponderance of the evidence that it was prejudiced by this delay. Here, the State did not present any evidence that its ability to prosecute Silvers has been prejudiced by his delay in seeking post-conviction relief.

[29]     In a novel argument, the State claims the prejudice it suffered was its diminished ability to rebut Silvers's PCR claims, Appellee's Br. at 32, not any diminished ability to prosecute Silvers. In support, the State argues our precedent holds that prejudice in the post-conviction laches context includes not only a material reduction in the reasonable likelihood of successful reprosecution but also a reduction in the State's ability to defend against a PCR petition.

[30]     First, the State cites Justice Massa's concurring opinion in *Humphrey v. State* for the proposition that "laches is simply an equitable doctrine that provides a remedy where one party's undue delay causes the other party prejudice in some way." Appellee's Br. at 33 (citing *Humphrey v. State*, 73 N.E.3d 677, 691–92 (Ind. 2017) (Massa, J., concurring)). While this argument is an accurate statement of the doctrine of laches generally, *see Foster*, 235 N.E.3d at 1256; *SMDfund*, 831 N.E.2d at 728–32; *Armstrong*, 747 N.E.2d at 1120–23, it ignores our precedent on the doctrine of laches in the PCR context, *see Armstrong*, 747 N.E.2d at 1120; *Stewart*, 548 N.E.2d at 1176–77. Furthermore, Justice Massa's concurrence in *Humphrey* primarily focused on the unreasonable delay prong of the PCR laches inquiry; he did not discuss what constitutes prejudice for laches generally or for PCR laches specifically, other than citing to *Armstrong* and the proposition that "prejudice exists when the unreasonable delay operates to materially diminish a reasonable likelihood of successful re-prosecution." *Humphrey*, 73 N.E.3d at 690–93. Justice Massa did note that the State in *Humphrey* "attempted to prove prejudice by showing witnesses would be

unavailable for retrial, but Humphrey's counsel was successful in rebuttal." *Id.* at 692. We do not follow the State's argument as to how this concurring opinion helps their efforts that prejudice can be shown through more than just a diminished ability to reprosecute.

[31] However, the State also relies on this court's decision in *Jent v. State*, 120 N.E.3d 290 (Ind. Ct. App.), *trans. denied*, 127 N.E.3d 232 (Ind. 2019), for the proposition that "prejudice to the State can be measured by more than just a diminished ability to retry a petitioner but may also be established by an inability to contest post-conviction claims." Appellee's Br. at 34. In *Jent*, the petitioner sought post-conviction relief 15 years after pleading guilty to four misdemeanors, claiming "his guilty plea was not knowingly made, that there was an insufficient factual basis to support his guilty plea, and that he was denied the assistance of guilty plea counsel." 120 N.E.3d at 292. By the time of the evidentiary hearing on the petitioner's PCR claims, no transcript of the original guilty plea existed because it had been destroyed pursuant to Indiana's policy that misdemeanor records are only kept for ten years. *Id.* at 292, 293–94.

[32] The State claims "the only use of the guilty plea transcript [in *Jent*] would have been to evaluate [the petitioner's] post-conviction claims." Appellee's Br. at 33. However, in *Jent* we explained that "the State failed to present evidence to the post-conviction court in its pleadings alleging the specific prejudice it suffered by Jent's unreasonable delay." 120 N.E.3d at 294. That is, the State in *Jent* did not explain how it would have used the guilty plea transcript if it had not been destroyed. *See id.* We also note that this court seemed to believe that the guilty

plea transcript materially diminished the likelihood of a successful reprosecution; in particular, this court recognized that "the destruction of documents can be prejudicial to the State and support an affirmative defense of laches" and in a parenthetical noted that this court has previously held "that the State was prejudiced by delay where it no longer has all the evidence needed to prosecute defendant." *Id.* (citing *Balderas v. State*, 116 N.E.3d 1141, 1144–45 (Ind. Ct. App. 2018)). Furthermore, there is nothing in this record to indicate any documents have been destroyed as they had been in *Jent.*

[33] Nevertheless, we recognize that our decision in *Jent* opened the door to the State's novel argument in this case. Although it appears that laches is not often used in this manner in the PCR context, we cannot say that it is impossible for the State to establish prejudice by demonstrating its inability to defend against a petitioner's PCR claims. Even if we accepted this novel argument as an approach to proving prejudice, the State has not met its burden of showing prejudice; nor has it met its burden of showing prejudice under our Supreme Court's decision in *Armstrong*.[7] We therefore must conclude that the State failed to prove by a preponderance of the evidence its affirmative defense of laches, so the trial court erred in determining that Silvers's PCR claims are barred by laches.

---

[7] As we will explain in the next section, Plummer's inability to recall the specifics of his performance damaged Silvers's case more so than it did the State's case. Silvers had the burden of proof in this matter, and his main witness could not remember why he took certain actions. This lack of memory affected Silvers's ability to prove he received ineffective assistance of counsel.

## 2. The PCR Court Did Not Err by Denying Silvers's PCR Petition

Silvers next contends that the PCR court erred when it denied his PCR petition on the merits. The PCR court entered the following relevant findings and conclusions regarding the merits of Silvers's claims:

> [T]he evidence before the Court shows that Plummer was highly active in working on Silvers'[s] case, both before and during trial.
>
>  * * *
>
> Silvers has provided the Court with no evidence that Plummer's significant decisions failed to be made in the exercise of reasonable professional judgment.
>
>  * * *
>
>  . . . Silvers has failed to address the underlying reasons behind the decisions Plummer made in handling his case. Even if Plummer would have agreed that he would have done things differently in hindsight, this still would not have met Silvers'[s] burden to overcome the presumption of adequate assistance. Silvers stated that Plummer didn't seem well-versed in Fourth Amendment law, but he did not argue that Plummer's ignorance of the law resulted in any of the trial decisions that Silvers now disagrees with.
>
>  * * *
>
> Plummer made 32 filings on Silvers'[s] behalf prior to trial. He was proactively working on Silvers'[s] case, kept Silvers highly involved in decision-making, visited Silvers multiple times in jail, and attempted to win the trial for Silvers. The evidence before

the Court indicates that Plummer's actions were at least reasonable under prevailing professional norms, if not above and beyond them . . . .

Appellant's App. Vol. VI at 40–44.

[35] Our Supreme Court has explained our standard of review for post-conviction claims as follows:

> Post-conviction actions are civil proceedings, meaning the petitioner (the prior criminal defendant) must prove his claims by a preponderance of the evidence. Ind. Post-Conviction Rule 1(5); *Wilkes v. State*, 984 N.E.2d 1236, 1240 (Ind. 2013). If he fails to meet this burden and receives a denial of post-conviction relief, then he proceeds from a negative judgment and on appeal must prove "that the evidence, as a whole, unmistakably and unerringly points to a conclusion contrary to the post-conviction court's decision." *Wilkes*, 984 N.E.2d at 1240 (quoting *Ben-Yisrayl v. State*, 738 N.E.2d 253, 258 (Ind. 2000)). When reviewing the court's order denying relief, we will "not defer to the post-conviction court's legal conclusions," and the "findings and judgment will be reversed only upon a showing of clear error—that which leaves us with a definite and firm conviction that a mistake has been made." *Humphrey v. State*, 73 N.E.3d 677, 682 (Ind. 2017) (quoting *Ben-Yisrayl v. State*, 729 N.E.2d 102, 106 (Ind. 2000)).

*Bobadilla v. State*, 117 N.E.3d 1272, 1279 (Ind. 2019).

[36] Silvers claims he received ineffective assistance of trial counsel. To evaluate a petitioner's ineffective-assistance-of-counsel claim, "we apply the well-

established, two-part *Strickland* test."[8]  *Bobadilla*, 117 N.E.3d at 1280 (citing *Humphrey*, 73 N.E.3d at 682).  Under that test, "the defendant must prove:  (1) counsel rendered deficient performance, meaning counsel's representation fell below an objective standard of reasonableness as gauged by prevailing professional norms; and (2) counsel's deficient performance prejudiced the defendant, i.e., but for counsel's errors the result of the proceeding would have been different."  *Id.* (citing *Ward v. State*, 969 N.E.2d 46, 51 (Ind. 2012)).  "Failure to satisfy either prong will cause the claim to fail."  *Conley v. State*, 183 N.E.3d 276, 283 (Ind. 2022) (quoting *French v. State*, 778 N.E.2d 816, 824 (Ind. 2002)).

[37]     "There is a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.  Counsel is afforded considerable discretion in choosing strategy and tactics and these decisions are entitled to deferential review."  *Weisheit v. State*, 109 N.E.3d 978, 983 (Ind. 2018) (internal citations omitted) (citing *Stevens v. State*, 770 N.E.2d 739, 746–47 (Ind. 2002)).  Moreover, "isolated mistakes, poor strategy, inexperience and instances of bad judgment do not necessarily render representation ineffective."  *Id.* at 984 (citing *Stevens*, 770 N.E.2d at 747).  We also consider the "legal precedent available to counsel at the time of his representation of the accused, and counsel will not be deemed ineffective for

---

[8] *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

not anticipating or initiating changes in the law." *Lee v. State*, 91 N.E.3d 978, 987 (Ind. Ct. App. 2017) (quoting *Sweeney v. State*, 886 N.E.2d 1, 8 (Ind. Ct. App. 2008), *trans. denied*) (citing *Smylie v. State*, 823 N.E.2d 679, 690 (Ind. 2005)), *trans. denied*.

[38] Silvers alleges Plummer was ineffective for (a) failing to object to the Amended Information and alleged prosecutorial misconduct at trial, (b) stipulating that Silvers authored two of the handwritten notes, and (c) failing to file a motion to suppress certain evidence. We address each allegation in turn.

### a. Failure to Object

[39] Silvers argues Plummer was deficient because he failed to object to (i) the amended charging information and (ii) alleged prosecutorial misconduct at trial. When a petitioner claims that trial counsel was ineffective for failing to object, the petitioner "must prove that the trial court would have sustained the objection" to show prejudice under the second prong of the *Strickland* test. *Passwater v. State*, 989 N.E.2d 766, 770 (Ind. 2013) (citing *Lowery v. State*, 640 N.E.2d 1031, 1042 (Ind. 1994)).

### i. Amended Information

[40] First, Silvers contends Plummer was deficient for failing to object to the State amending the burglary charge outside the statutory window for such an amendment. At Silvers's initial hearing, the trial court set the omnibus date as September 22, 1997. On September 2, 1997, the State filed an amended charging information (the "Amended Information"), modifying the burglary

charge from a Class B felony to a Class A felony; no other changes were made. Plummer did not object to the Amended Information at any time during the proceedings.

[41] Silvers specifically claims Plummer was deficient for failing to object to the Amended Information pursuant to Indiana Code section 35-34-1-5 because the State sought to file the Amended Information less than 30 days before Silvers's omnibus date and the amendment was one of substance—changing the burglary charge from a Class B felony to a Class A felony. The same version of Indiana Code section 35-34-1-5 was in effect when Silvers committed his crimes, when the State filed the initial information, and when the State filed the Amended Information:

> (b) The indictment or information may be amended in matters of substance or form, and the names of material witnesses may be added, by the prosecuting attorney, upon giving written notice to the defendant, at any time up to:
>
> > (1) thirty (30) days if the defendant is charged with a felony; or
> >
> > (2) fifteen (15) days if the defendant is charged only with one (1) or more misdemeanors;
>
> before the omnibus date.
>
> (c) Upon motion of the prosecuting attorney, the court may, at any time before, during, or after the trial, permit an amendment to the indictment or information in respect to any defect,

imperfection, or omission in form which does not prejudice the substantial rights of the defendant.

I.C. § 35-34-1-5 (effective 1993 to May 7, 2007).

[42] The State does not dispute that the amendment was of substance rather than form and that the prosecutor filed the amendment less than 30 days before the omnibus date. Instead, the State argues that caselaw in effect at that time permitted substantive amendments to the charging information after the statutory deadline and, in turn, Plummer did not render deficient performance by failing to object.

[43] In *Fajardo v. State*, the Indiana Supreme Court considered the legislative history and prior judicial application of Indiana Code section 35-34-1-5, including during the time period relevant here. 859 N.E.2d 1201, 1204–06 (Ind. 2007). This court has previously explained the *Fajardo* decision as follows:

> The Court noted that the statute clearly required that all amendments as to substance must be filed no later than thirty days before the omnibus date in felony cases. [*Fajardo*, 859 N.E.2d] at 1206. Despite the statutory language, the Court noted, "Ensuing case law, however, has been inconsistent and conflicting, often reflecting the practice and procedure under prior statutes, or imprecisely disregarding the subsection 5(b) timeliness requirement for amendments to substance in favor of the absence of prejudice requirement that subsections 5(a)(9) and 5(c) apply only to amendments of form." *Id.*

> The Court further stated:

Several cases have permitted amendments related to
matters of substance simply on grounds that the
changes did not prejudice the substantial rights of
the defendant, without regard to whether or not the
amendments were untimely.  Several other cases
likewise have not focused upon whether the
challenged amendment was one of form or
substance, but have employed components of the
substance/form test (whether defense equally
available and evidence equally applicable, and
whether amendment not essential to making a valid
charge) to assess whether the defendant's substantial
rights were prejudiced, which is not a controlling
factor for permitting substantive amendments.  The
methodology employed in the cases identified in
this paragraph does not comply with Indiana Code
§ 35-34-1-5.

*Id.* at 1206–07 (citations and footnotes omitted).

Thus, in *Fajardo*, the Court disapproved of nineteen Indiana
Supreme Court and Court of Appeals cases over the previous
twenty years where the plain language of Indiana Code section
35-34-1-5(b) had been disregarded.  The Court further clarified
that, going forward, the timeliness requirement for filing
substantive amendments must be followed.

*Cole v. State*, 61 N.E.3d 384, 388–89 (Ind. Ct. App. 2016), *trans. denied*.

[44]     The discussion in *Fajardo* serves to emphasize that, at the time Silvers faced

criminal charges in this case, the law around this issue was not clear, and there

were appellate and supreme court decisions that found no error in substantive

amendments that changed the type and level of offense charged even if the State

submitted the amendments after the statutory deadline. *See, e.g.*, *Brown v. State*, 728 N.E.2d 876, 879–90 (Ind. 2000) (citing *McIntyre v. State*, 717 N.E.2d 114, 125 (Ind. 1998)) ("If the amendment does not affect any particular defense or change the positions of either of the parties, then it does not prejudice the defendant's substantial rights.") (abrogated by *Fajardo*); *Tripp v. State*, 729 N.E.2d 1061, 1065 (Ind. Ct. App. 2000) (amendment of information to add a new charge after omnibus date was permissible) (abrogated by *Fajardo*); *Todd v. State*, 566 N.E.2d 67, 69–70 (Ind. Ct. App. 1991) (amendment of information to add new charges on the day of trial was permissible) (abrogated by *Fajardo*); *but see e.g.*, *Haak v. State*, 695 N.E.2d 944, 951 (Ind. 1998) ("[I]f the amendment was of substance, or prejudicial to the defendant even if of form, it was impermissible under the statute.").

[45] Because of conflicting caselaw regarding Indiana Code section 35-34-1-5 at all times relevant to this case, Plummer likely had a firm basis on which to object to the Amended Information, but so, too, would the trial court have had a firm basis on which to overrule that objection. Therefore, we conclude that Silvers has failed to show he was prejudiced by Plummer's failure to object to the Amended Information.

### ii. Prosecutorial Misconduct

[46] Second, Silvers argues Plummer was deficient for failing to object to certain questions and arguments the State asked of and made about Pfleider. Pfleider—who would have been approximately 14 years old at the time of the robbery—testified that in 1997, he was friends with and bought drugs from

Bultman, and he visited Bultman at Mr. C's three times on July 28, 1997: at approximately 2:30 a.m., 3:30 a.m., and 4:30 a.m. Pfleider had smoked five or six marijuana joints before first visiting Bultman that morning and stated he smoked marijuana with Bultman each time he visited Mr. C's. According to Pfleider, he saw two men in camouflage clothing speaking with Bultman during all three of his visits; Pfleider recognized one of the men as Scott, and Bultman identified the other man to Pfleider as Scott's uncle. Pfleider testified that he did not see Silvers with the men during any of his visits. During Pfleider's last visit at 4:30 a.m., he saw Bultman return from Scott and his uncle's car with a "set of keys." DA Tr. Vol. II at 183. Pfleider opined that Bultman was "[p]robably not" a trustworthy person. *Id.* at 185.

[47] On direct examination, Plummer asked Pfleider if he was currently incarcerated, and Pfleider stated that he was. Plummer later asked why Pfleider was in prison, and Pfleider testified he was incarcerated for "[s]elling LSD." DA Tr. Vol. II at 177. On cross-examination, the State followed up on this testimony as follows:

> Q Danny, . . . [i]n fact you're in Jail for selling LSD . . . to school children. Isn't that correct?
>
> A Yes, that's right.
>
> Q And, it's your opinion that Mr. Bultman is not trustworthy. Right? The opinion of a convicted LSD dealer who sells to school children. Correct?

A  Yeah.

*Id.* at 185.  Plummer did not object to this line of questioning.

[48]   Pfleider admitted on cross-examination that he drove himself to Mr. C's each time he visited Bultman on July 28 despite Pfleider being 14 years old and not having a driver's license.  Pfleider further testified that he and Silvers were both in the Lawerence County jail from January 28, 1999, to January 26, 2000.  The State followed up on this testimony as follows:

> Q  Now getting back to your relationship with Mr. Silvers, as I said, you got out of Jail January 26th of 2000, and then you went back in on March 14th of 2000.  Does that sound about right?
>
> A  Yes.
>
> Q  While you were in Jail that time you helped Kerry Silvers plan his escape, didn't you, Mr. Pfleider?
>
> A  No, I didn't.
>
> Q  In fact, you picked him up after he escaped and took him down to Orange County, didn't you?
>
> A  No, I didn't.
>
> Q  So it's just a total coincidence that his escape the day after you got out of Jail?
>
> A  Yeah.

DA Tr. Vol. II at 192–93.  Plummer did not object to this line of questioning.

[49]     In its closing argument, the State discussed Pfleider's testimony in relevant part as follows:

> [W]hat does he give you?  He gives you, most interestingly, Danny Pfleider.  Danny Pfleider.  Convicted of selling LSD to school children. . . .  [A]fter it appeared that a trial was absolutely inevitable no matter how much he might try to avoid it, he adds Danny Pfleider to walk in here and quite literally, I mean, I don't want to overstate it, I've done this for a long time now, but to absolutely profane this Courtroom with Perjury.  That's the defense.  That's the defense.  That's all the defense there is of any significance.

DA Tr. Vol. II at 237.  Plummer did not object to this part of the State's closing argument.

[50]     At the PCR hearing, when asked why he did not object to these questions and arguments from the State, Plummer testified that although he could not recall the specific reasons, his general practice was to not object to questions or arguments that undercut the State's credibility with the jury.  Assuming arguendo that Plummer's failure to object to certain questions and arguments the State asked of and made about Pfleider was deficient, Silvers has not shown that he would have obtained a different result at trial if Plummer had objected to those questions and arguments.  Even without the now-challenged questions and arguments from the State, Pfleider had a credibility problem—Pfleider was 14 years old at the time of the robbery, he admitted to driving without a license the morning of the robbery, he admitted to smoking at least five or six

marijuana joints before going to Mr. C's that morning, and he admitted to smoking more marijuana while at Mr. C's. In other words, the State still would have been able to attack Pfleider's credibility during closing argument even without the additional information brought about by the State's cross-examination.

[51] Moreover, it is not likely the State's case against Silvers could have been overcome by a more credible Pfleider. Although Bultman also had a credibility problem, key details of his testimony were corroborated by other witnesses, including Scott's identity as one of the robbers, the clothing the robbers wore, and the information the robbers had about Mr. C's. Silvers fit the description of the larger of the two men who robbed the Craigs, and they were also able to identify him by voice.

[52] Based on the foregoing, Silvers has not established that he would have obtained a different result at trial had Plummer objected to the State questioning Pfleider about the details of his conviction for dealing LSD, the State questioning Pfleider about his potential role in helping Silvers escape from the Lawrence County jail in May 2000, and the State arguing that Pfleider did not testify honestly and committed perjury. Accordingly, we cannot say Plummer was ineffective for not making these objections.

### b. Stipulation

[53] Silvers contends Plummer was deficient for stipulating that Silvers wrote the two notes that identified the exact locations of the items stolen from the Craigs

and that instructed how he wanted those items to be disposed. On July 30, 1997, while Silvers was in the Lawrence County jail, he asked another inmate to help him "get rid of some things he had stolen, that he had hidden out," DA Tr. Vol. II at 21. Silvers' brother Kerby, who was also in the Lawrence County jail, wrote directions for the location of the stolen items, and Silvers wrote what could be found there and what to do with the items. Silvers told the inmate that "he was afraid that [Scott] would crack under pressure after the police talked to him," which is why he wanted to get rid of the things stolen during the July 28 robbery. *Id.* at 29. Instead of contacting someone on Silvers's behalf, the inmate contacted the Lawrence County Sheriff's Department and eventually handed over the three notes to Indiana State Police Detective Christopher Lewis. Detective Lewis followed the directions on the notes, which led him "right to the evidence in the case that was stolen from the Ron Craig residence and the clothing and other articles used in the robbery." *Id.* at 36–37.

[54] At trial, Plummer stipulated that Silvers "authored" two of the handwritten notes. DA Tr. Vol. II at 38; *see also id.* at 39–41. During the discussion that occurred over the stipulation, Plummer advised he made this stipulation "[j]ust in the interests of time . . . and [j]udicial economy." *Id.* at 38–39.

[55] Silvers now claims the stipulation amounted to an admission of guilt that he did not authorize Plummer to make. In support of this claim, Silvers testified at the PCR hearing that his preferred strategy was to contest he wrote the notes and that he "never would have agreed to" the stipulation. Tr. Vol. II at 70.

[56]     At the PCR hearing, Plummer did not recall the notes, making the stipulation, or the reasons for making the stipulation. When asked if he had "any thoughts on why [he] would have made that stipulation," Plummer testified:

> . . . I have vague recollections of working directly with [Silvers] about these letters and that I had big concerns about them. Whether it was an issue of me trying to take the wind out of the State's sails, strategic, strategically since I knew that they had an expert that's going to come in. Whether there was some reason that it was stipulated so at the end of the day I had an argument that fit into the theory that included why I would have stipulated. But again, this is speculation because I can't remember what I did twenty-five years ago. That's a very vague recollection of these letters. But I do know that I worked with Kerry Silvers very closely in all aspects of the trial including this one to develop strategies as to why we did what we did.

Tr. Vol. II at 49–50. Plummer did, in fact, use the stipulation to argue that Silvers knew where the stolen items and the items used in the robbery were located because "[h]e was with Scott Craig at the time of the arrest. Scott Craig could have told Kerry Silvers that. . . . Has the State presented any evidence that that would not be possible? No, they have not." DA Tr. Vol. II at 246. The stipulation also eliminated the State's ability to present a handwriting expert witness. Strategically, we cannot say Plummer erred by not forcing the State to present experts who could have testified that Silvers wrote the notes. From the trial transcript, it appears Plummer's strategy was to contend that the notes did not prove Silvers committed the offense; rather, they only showed that Silvers knew where the items were and that he knew that information because Scott told him. A jury could have wondered why it was so important to contest

who authored the notes when the defense theory did not hinge on authorship of the notes but instead on knowledge of the contents of the notes.

[57]     Based on the foregoing, we cannot agree with Silvers that the stipulation amounted to an admission of guilt. The record suggests that Plummer stipulated Silvers authored two notes for strategic purposes. Therefore, Plummer was not ineffective for making the stipulation.

### c. *Failure to File Motion to Suppress*

[58]     Silvers argues Plummer was deficient for failing to file a motion to suppress evidence that Silvers claims was discovered pursuant to an illegal arrest. To determine if trial counsel was ineffective for failing to pursue this motion, we first determine the likelihood that this motion would have been successful. *See Ware v. State*, 78 N.E.3d 1109, 1114 (Ind. Ct. App. 2017). If the motion would have likely been successful, we then determine whether the result of the proceeding would have been different if the evidence had been suppressed. *See Bobadilla*, 117 N.E.3d at 1280 (citing *Ward*, 969 N.E.2d at 51); *Helton v. State*, 907 N.E.2d 1020, 1023 (Ind. 2009).

[59]     Specifically, Silvers contends Plummer should have filed a motion to suppress any evidence seized as a result of Silvers's arrest. We note that on January 5, 1999, Plummer filed a motion to suppress evidence collected from the passenger compartment, trunk, and tires of the vehicle Silvers was driving when he was arrested on July 28, 1997. Plummer alleged the searches of those areas of the vehicle were conducted without a warrant and without consent. Silvers

now argues that Plummer should have also sought to suppress all other evidence seized pursuant to "an illegal, warrantless arrest made without probable cause and using excessive force." Appellant's Br. at 45.

[60] At the time Silvers was arrested, it was "well settled that a police officer may arrest a suspect without a warrant if that officer has probable cause to believe that the suspect has committed a felony." *Sears v. State*, 668 N.E.2d 662, 666–67 (Ind. 1996) (citing *Tennessee v. Garner*, 471 U.S. 1, 7 (1985); *United States v. Watson*, 423 U.S. 411, 417 (1976); *Carroll v. United States*, 267 U.S. 132, 156 (1925); *Bergfeld v. State*, 531 N.E.2d 486, 489 (Ind. 1988)), *overruled on other grounds by Scisney v. State*, 701 N.E.2d 847, 848–49 (Ind. 1998). "Probable cause exists when, at the time of the arrest, the arresting officer has knowledge of facts and circumstances which would warrant a man of reasonable caution to believe that the defendant committed the criminal act in question." *Id.* at 667 (citing *Green v. State*, 461 N.E.2d 108, 112 (Ind. 1984)).

[61] Here, when law enforcement officers stopped Silvers and arrested him, they knew that two men had robbed the Craigs and that three weeks earlier, Scott and Silvers had discussed with Bultman their plans to rob the Craigs and then Mr. C's. Officers also knew that Scott and Silvers had been driving a burgundy-colored car belonging to Silvers's mother, and that the two had been at Silvers's mother's house hours before the robbery. Consequently, when officers spotted a burgundy car bearing a plate that was registered to Silvers's mother, they had probable cause to believe Silvers and Scott were inside, and the officers had reason to believe Silvers had participated in robbing the Craigs; that is, the

officers had probable cause to believe Silvers had committed a felony, thereby negating the need for an arrest warrant. *See Sears*, 668 N.E.2d at 666–67.

[62] Regarding Silvers's claim that the arresting officers used excessive force, such a claim is not a basis for suppressing evidence. *See United States v. Ramirez*, 523 U.S. 65, 71 (1998) ("Excessive or unnecessary property destruction during a search may violate the [Fourth] Amendment, even though the entry itself is lawful and the fruits of the search not subject to suppression."). Furthermore, Silvers does not cite any precedent demonstrating that the trial court would have been required to grant a motion to suppress based on the officers' alleged use of excessive force when arresting Silvers. Silvers has therefore failed to show that the trial court would have granted a motion to suppress based on the alleged illegality of his arrest and the alleged use of excessive force in effectuating it.

[63] Even if such a motion to suppress would have been granted, Silvers has not demonstrated that excluding that evidence from trial would have resulted in a different outcome at trial. Silvers argues that "[t]here is a reasonable probability that but for counsel's deficient performance in failing to move to suppress the evidence seized as a result of [Silvers]'s illegal arrest, the outcome of [Silvers]'s trial would have been different." Appellant's Br. at 54. In support, Silvers contends tire track and shoe print evidence would not have been admitted. Silvers does not explain how excluding this evidence would have resulted in a different outcome.

Both Ronald and Leesa testified that they recognized Silvers's voice as the voice of one of the men who robbed them, Bultman testified that Silvers was one of the two men who talked to him about robbing the Craigs and Mr. C's, and one of Silvers's fellow inmates testified that Silvers wrote specific directions on where to find items stolen from the Craigs and what to do with those items. Because this evidence would have been sufficient to support Silvers's convictions, he has not demonstrated that but for Plummer's failure to file a motion to suppress based on the facts and circumstances of Silvers's arrest, Silvers would have obtained a different result at trial. Therefore, we cannot say Plummer was ineffective for failing to file such a motion.

## Conclusion

In sum, the PCR court erred in determining that Silvers's claims are barred by laches, but it did not err in denying Silvers's PCR petition because Silvers's did not meet his burden of showing he received ineffective assistance of trial counsel. We therefore affirm the PCR court's denial of Silvers's PCR petition.

Affirmed.

Pyle, J., and Weissmann, J., concur.

ATTORNEY FOR APPELLANT

Victoria Bailey Casanova
Casanova Legal Services, LLC
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Indiana Attorney Genera

Daylon L. Welliver
Deputy Attorney General
Indianapolis, Indiana